# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-03-00109-CR

---

**Michael Scott, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NO. 996378, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING**

---

## O P I N I O N

A jury convicted appellant Michael Scott of capital murder. *See* Tex. Pen. Code Ann. § 19.03(a)(2) (West Supp. 2004-05). The district court sentenced him to life imprisonment after the jury found that there was not a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (West Supp. 2004-05).[1]

Scott brings forward three points of error challenging the sufficiency of the evidence to sustain the guilty verdict. In five points of error, he contends the court erred by admitting in evidence statements that he and another party to the offense made to the police. Scott's remaining

---

[1] The applicable provisions of section 19.03 and article 37.071 have not been changed since the offense was committed.

points of error assert that the court erred by admitting irrelevant and unfairly prejudicial evidence offered by the State, excluding expert testimony offered by the defense, and failing to instruct the jury on the law of accomplice witness testimony. We sustain Scott's contention that the admission of the other party's statement violated his Sixth Amendment confrontation right, but we overrule all of his remaining points of error. Because we determine beyond a reasonable doubt that the Sixth Amendment error did not contribute to the conviction, we affirm the district court's judgment.

## Background

### *The Yogurt Shop Murders*

On Friday, December 6, 1991, the owner of a party-supply store in a northwest Austin strip mall was working late when he heard sounds that seemed to come from the roof, followed by popping noises. He looked outside and saw smoke coming from the front of the frozen yogurt shop next door to his store. Smoke was also entering his store, so he opened the back door for ventilation. He noticed that the back door of the yogurt shop was partially open, and he could see flames inside. At that moment, a police officer drove into the alley behind the stores, saw the fire, and reported it. The time was 11:47 p.m.

The first firefighters to arrive at the yogurt shop found the front door locked, but they were able to open it with little difficulty. The shop was dark and full of smoke. The firefighters began to extinguish the blaze, which was worst in the rear of the shop. As they worked their way to the back of the building, they discovered four bodies later identified as those of seventeen-year-old Eliza Thomas, an employee of the yogurt shop; Thomas's coworker Jennifer Harbison, who was also seventeen; Jennifer's fifteen-year-old sister, Sarah Harbison; and Sarah's thirteen-year-old friend,

2

Amy Ayers. Amy was planning to spend the night with Sarah, and the two younger girls had walked to the yogurt shop from Northcross Mall, a nearby shopping mall, to wait for a ride home with Jennifer.

The space occupied by the yogurt shop was deep and narrow. The front two-thirds of the space was the public area, with tables and a counter on which the cash register was located. On the night in question, the chairs had been stacked on the tables as part of the closing routine. Behind the counter was a wall with a door on the right-hand side that opened into the rear third of the shop. A person walking through this door entered a preparation area with a sink and table; the cash register drawer was found on this table. On the right wall of this area were the bathrooms; on the opposite wall was a walk-in cooler. Behind the cooler, in the left rear corner of the shop, was a storage area with shelves full of paper goods and cleaning materials. In the right rear corner was the shop's office, the door of which was closed.

Amy Ayers's body was found on the floor of the preparation area. She had a ligature around her neck and it was determined at autopsy that she had been manually strangled, but not fatally. She also had a bruise on her lower lip. She was naked, and a blouse tied into a knot was found beneath her body. Ayers had two contact gunshot wounds, one on the top left side of her head and the other behind her left ear. The first of these was caused by a .22-caliber bullet which did not penetrate the skull; the medical examiner testified that this shot was not fatal. The second, fatal gunshot wound was caused by a .380-caliber bullet that passed through the brain and exited through Ayers's right cheek.

The other three bodies were found on the floor of the storage area, covered with rubble from the fire. Eliza Thomas's body was lying on top of Sarah Harbison's body, and Jennifer Harbison's body was lying beside them. They, too, were naked. The evidence suggests that the three bodies had been stacked, and that Jennifer's body had rolled off the pile during the fire. All three bodies were badly burned and charred, with Jennifer's having been most severely damaged. Thomas's hands were tied behind her with a brassiere and she had a gag in her mouth. Sarah Harbison's hands were tied behind her with panties and she also had been gagged. There was physical evidence that she had been vaginally assaulted, probably with the handle of the ice cream scoop found on the floor between her legs. Jennifer Harbison's hands were behind her back as if they had been tied, but no binding was recovered. She had a ligature around her neck. Each of these girls had been killed by a single .22-caliber contact gunshot to the back of the head.

Four .22-caliber bullets were recovered from the bodies during autopsy. Due to the condition of the bullets, it was not possible to determine if all four had been fired from the same weapon. A .380-caliber bullet and a .380-caliber shell casing were recovered at the scene of the murders. The unusual rifling pattern on the .380 bullet led a firearms expert to conclude that it was fired from an AMT Backup, a small silver-gray semiautomatic pistol. The murder weapons were never found.

Melvin Stahl, an arson investigator for the Austin Fire Department, initially concluded that the fire at the yogurt shop had been started on the shelves in the storage area and then had spread up the wall, across the ceiling, and down the opposite wall. Under this theory, the bodies had been burned primarily by radiant heat. Marshall Littleton, a special agent with the Bureau of

4

Alcohol, Tobacco, and Firearms, reviewed the photographic evidence in October 1999. Based on his analysis of the burn patterns, the damage to the bodies, and the relative amount of damage to other items in the area, Littleton concluded that the fire had begun on the bodies, in the center of the storage area. Stahl testified that after reviewing Littleton's findings and the evidence on which it was based, he agreed with the conclusion that the fire began on the bodies.

The manager of the yogurt shop described the store's closing routine. One of the girls would first lock the front door, leaving the key in the double-cylinder dead-bolt lock so it would not be misplaced, then stack the chairs and sweep and mop the front service area. Meanwhile, the other girl would take the cash register drawer to the table in the preparation area, count the money and prepare a printed report, then drop the money into a combination safe in the floor. After that, the various food products would be placed in the cooler, and the yogurt machines, serving implements, and storage vessels would be washed. The girls would leave through the front door, relock it, and slide the key under the door in an envelope. After the fire, the key was found still in the front door lock.

The manager testified that the back door of the shop had a dead-bolt lock with a thumb latch on the inside. The manager had the only key to the back door, which ordinarily remained closed and locked. As previously noted, the back door was open on the night of the offenses.

### Scott's Statements

Scott was seventeen years old at the time of the murders and shared an apartment with Robert Springsteen, who was also seventeen. Scott and Springsteen were first interviewed by the

5

police in connection with the yogurt shop murders on December 15, 1991. The day before, their friends Maurice Pierce, aged sixteen, and Forrest Welborn, aged fifteen, had been arrested in Northcross Mall after Pierce was seen carrying a loaded .22-caliber revolver.[2] Scott and his friends denied any involvement in the murders. The police, who were overrun with leads regarding the yogurt shop murders, did not pursue this line of inquiry.

In 1998, Austin police detective Paul Johnson organized a task force to reexamine the evidence in the yogurt shop case. One of the leads he decided to reopen was the "Pierce tip." In February of that year, Johnson spoke to Scott, now married and living in Austin, by telephone. Scott gave Johnson a brief, innocent account of his activities on the night of the murders. In September 1999, Johnson assigned Sergeant Ronald Lara to conduct a follow-up interview.

Lara called Scott, who agreed to meet him on September 9, 1999, to give a statement. At 8:30 a.m. that day, Lara and Detective John Hardesty met Scott in the parking lot of Scott's wife's employer. They drove Scott to police headquarters where, at 9:10 a.m., he was taken to a homicide interview room equipped with a hidden videotape camera. Lara testified that he had intended to "spend maybe an hour or two with [Scott] to obtain the information that he had relevant to the Maurice Pierce tip and to move on." The officers soon realized, however, that "things were just not going as normal in the witness interview." They sensed that Scott was "deceiving, was kind of

---

[2] William Sorrow, a firearms examiner for the Texas Department of Public Safety, testified that tests he conducted in 1991 were inconclusive as to whether the .22-caliber revolver found in Pierce's possession fired the fatal bullets at the yogurt shop. John Murdock, a firearms expert with the Bureau of Alcohol, Tobacco, and Firearms, conducted additional tests in 2000 and 2001. He testified that the .22 revolver in Pierce's possession was not the murder weapon.

6

holding back on us." They decided to "go in there and continue talking, questioning him about things that he knew."

During the course of the day, Scott was questioned by Lara, Hardesty, and Detective Robert Merrill.[3] Scott told the officers in broad terms that he, Springsteen, Pierce, and Welborn had gone to the yogurt shop to commit a robbery, murdered the four girls, and set the fire to hide their tracks. At 8:00 p.m., Scott asked to be taken to the yogurt shop location. Merrill drove him there, accompanied by several other officers. They returned to the police station at about 9:30, where Scott was questioned by Merrill in the interview room for about one more hour before being driven home by Lara.

Scott was questioned further at the homicide office on September 10 and 12. He also spent the morning of September 12 driving around the western portion of Austin with Lara and Detective Manuel Fuentes in an unsuccessful attempt to find a bridge where Scott said he and his friends had gone after the murders. Later that afternoon, Lara drove Scott to a dry creek bed near the apartment he had shared with Springsteen to look for a pistol. On September 13, Scott invited Lara and Fuentes to his house, where he answered their questions for about an hour. On September 14, Scott gave an eight-page written statement to Fuentes and Ranger Sal Abreo.

Scott's written statement was admitted in evidence. Also admitted and played for the jury were videotapes of the eighteen hours of questioning in the homicide interview room on September 9, 10, and 12. The jury also heard audio recordings of Scott's in-car conversations with

---

[3] He was also briefly questioned by Bruce Stevenson, a civilian police employee who was called in to administer a polygraph examination at Scott's request. The polygraph examination was not conducted.

7

Lara on the mornings of September 10 and 12, as the officer was driving him to the police station, and of the questioning at Scott's house on the night of September 13. Finally, the jury heard testimony from police officers regarding statements Scott made at the scene of the crimes and elsewhere that were not recorded. In Scott's various statements, he told the police:

- Scott, Springsteen, Pierce, and Welborn were at the food court in Northcross Mall on the night of December 6, 1991. Pierce mentioned that he needed money and suggested committing a robbery. The young men left the mall and began to drive around the neighborhood in Pierce's car. It was decided that the yogurt shop would be a likely location for the robbery.

- They parked outside the yogurt shop and Scott, Springsteen, and Pierce went inside. Pierce placed an order while Scott and Springsteen went to the rear of the shop on the pretext of using the rest room. Scott and Springsteen opened the back door and walked out, leaving the door slightly ajar.

- Scott and his companions left the yogurt shop and returned to Northcross Mall to wait for the stores to close. Then they returned to the strip mall and parked in the alley behind the yogurt shop. Pierce was armed with a black .22-caliber revolver. Springsteen had a small semiautomatic pistol that Scott believed was a .38. Pierce, Springsteen, and Scott entered the shop through the back door, leaving Welborn in the car to act as lookout.

- They were surprised to find four girls inside the yogurt shop. Springsteen told Scott to check the front door to make sure it was locked. Scott found the door to be locked and noticed the key. He looked outside to see if anyone was nearby. He heard Pierce demanding to know where the money was and one of the girls telling him, "It's already been dropped and you can't get to it." He also heard "somebody get slapped."

- Springsteen asked Scott to come help him. Scott returned to the rear of the shop where he found Springsteen removing the girls' clothes. Scott began to tie the girls' hands with items of clothing; he remembered using a tee shirt and a brassiere. The girls were crying and begging not to be killed. Scott began to gag them, using what he remembered as "white like terry cloth."

- Scott returned to the front of the shop. He heard Pierce shout, "Where the fuck is the rest of the money." This was followed by a gunshot. Scott went to the back

8

of the shop to see what had happened and found one of the girls dead. Pierce repeated his demand for money to a second girl, then there was a second gunshot.

- Meanwhile, Springsteen was raping one of the other girls. Scott told him "that's not what he came here for." Springsteen stood up and told Scott to "do one of the girls." Scott was afraid of Springsteen but unable to get an erection, so he pretended to have sex with the girl. Pierce then handed Scott the revolver and told him to "finish her." Springsteen told Scott to "do it or I would be next." Scott pointed the gun at the back of the girl's head and fired.

- Pierce was now in "the other room" where the safe was located. The fourth girl was with him. Pierce told Scott, "You're in this neck deep already." Springsteen told Scott "not to be a puss." Scott, who was still holding the revolver, then shot the fourth girl in the back of the head. Scott identified a photograph of Amy Ayers as one of the girls he shot, and he said that she was still alive after he shot her. Scott said that Springsteen "shot one of the other girls again because she was still alive."

- Springsteen told Scott to "burn the place." Scott "saw the girls lying there and I pulled one of the girls on top of the other." He gathered up napkins, cups, and paper towels and "piled them on top of the three girls." Scott sprayed the girls with lighter fluid he had brought from the car and lit the fire.

- Scott recalled being in the yogurt shop for about twenty minutes. Welborn was not in the car when Scott, Springsteen, and Pierce left the shop. As they drove away, they found Welborn in the parking lot. They drove for about ten minutes, then stopped at a bridge. Scott vomited over the railing of the bridge. He also threw away a knife he had taken from the yogurt shop.

- That weekend, Scott, Springsteen, Pierce, and Welborn drove to Helotes in a sport-utility vehicle Pierce had stolen. The purpose of the trip was to visit a girl Scott had met at a summer music camp. They stopped at a store on the way and someone bought a newspaper. Scott read aloud the account of the murders and fire.

- Several days after the murders, Springsteen told Scott that Pierce had been arrested carrying the .22 revolver. Springsteen still had the .38 semiautomatic pistol. Scott took the pistol and buried it in the dry creek bed behind the apartment complex. A year later, he returned to the creek bed, retrieved the pistol, and gave it to a friend to dispose of.

9

*Springsteen's Statement*

Detective Merrill flew to Charleston, West Virginia, on September 14, 1999, to interview Springsteen. Springsteen agreed to speak to the officer at the police station the following day. The questioning lasted about five hours and was videotaped. In the course of the statement, Springsteen confessed to committing the yogurt shop murders with Scott, Pierce, and Welborn. The complete videotaped statement was introduced in evidence for record purposes only. Merrill read the following edited summary of Springsteen's statement to the jury:

> He said as we talked to him—he originally said that he did not know about the murders, did not even know they had occurred until he had been interviewed by the police.
>
> As the interview continued, he remembered he bought a newspaper and read it in a stolen Pathfinder on the way to San Antonio. During the interview, Robert Springsteen admitted involvement in the murders by telling us that he went into the yogurt shop prior to the robbery and opened the back door so he had a way to get in.
>
> Robert Springsteen said he went through the front door, then went to the bathroom. Robert Springsteen said when no one was looking he unlocked and opened the back door. Robert Springsteen said he propped it open by using a folded pack of cigarettes or a rock to keep the door from shutting all the way, saying it wasn't noticeable unless you were looking right at it. Robert Springsteen said at some point in time he went back that evening. He said he went through the back door.
>
> Robert Springsteen said there was a silver .380 automatic handgun used in the yogurt shop. Robert Springsteen said he raped a girl; stated he did not think he ejaculated. He said he shot a girl in the back of the head with the .380 as she was crawling, screaming, and crying. He demonstrated the position that Amy Ayers died, which was the position we found her in after the fire was extinguished.
>
> Robert Springsteen talked about hearing a total of five shots, maybe six, but remembered five. And after the robbery, Robert Springsteen said he left the yogurt shop, went to a bridge where he got out of the car and threw up. Then he ended the interview before we were complete.

10

## Other Testimony

Dearl Croft, owner of a private security company, parked his marked vehicle in front of the yogurt shop at around 10:00 p.m. on the night of the murders. When he went inside the shop, a teenaged male asked him if he was a police officer. When it was his turn to order, the young man refused to go to the counter and asked to use the rest room. Croft was in the shop for about twenty minutes and did not recall seeing this individual return. Eliza Thomas's mother, Maria Thomas, was visiting her daughter in the shop. She and her daughter were acquainted with Croft, who was a regular customer. She confirmed Croft's account, adding that the suspicious-acting young man was accompanied by another young male. Lucella Jones also recalled seeing two teenaged males at the yogurt shop that night. One of the them had his hand in a bag and "was playing with something—it sounded like marbles or something clicking together. And it frightened me." Jones was shown a photo spread containing Pierce's photograph. She said that Pierce's picture looked most like one of the persons she saw in the yogurt shop, but she did not make a positive identification. She did not identify either Scott or Springsteen in other photo spreads.

The manager of an Austin Nissan dealership testified that a Pathfinder was stolen from the lot on the Saturday or Sunday following the yogurt shop murders. Meredith Skipper testified that Scott, whom she had met at music camp, came to her home in Helotes in December 1991. He was accompanied by three friends, and they were driving a sports utility vehicle.

Sarah Adair was thirteen at the time of the murder. She testified that she and her older sister, Amanda, were friends of Scott and acquainted with Springsteen, Pierce, and Welborn. Adair was questioned by the police at her school a few weeks after the murders. Scott came to her

house later that day and wanted to know exactly what she had been asked by the police and what she had told them. Adair remembered seeing Scott with a black revolver in December 1991 or January 1992. Around that same time, she also saw Scott with a "silver, smallish gun."

Sarah's sister, Amanda Statham, testified that she visited Scott at his house shortly after the murders. Welborn was leaving as she arrived, and she heard Scott tell him to "keep his fucking mouth shut." On another occasion, Statham asked Scott why the police had been talking to him. Scott answered "kind of like, yeah, we shot them and raped them and blah, blah, blah. Kind of like half bragging, half joking, half—I don't know." Statham told Scott to "shut the fuck up; it wasn't funny." Statham also told her mother, Nancy Reed, what Scott had said. Reed testified that she told her daughter that Scott "was just trying to scare her."

Chandra Morgan was thirteen years old at the time of the murders. She testified that she met Pierce at Northcross Mall on the night of December 6, 1991. Pierce was with Welborn and two young men she did not know; she identified Scott at trial as one of them. At some point, they all took LSD, then went to the yogurt shop. The group then returned to the mall to play games in the arcade, where Morgan lost track of the others. Later that night, she saw Pierce, Springsteen, and Scott in a car outside the mall. They asked her if she had seen Welborn. Just then, Welborn walked into view from the direction of the yogurt shop. Welborn and Morgan got in the car and they began driving south from the mall. They were met by several fire trucks traveling north. When Morgan commented about the fire trucks, "They didn't respond. I mean, it was actually really quiet and weird." They drove to an elementary school playground, where Morgan and Pierce got out of the

12

car. Morgan noticed the others "doing something in the front around the glove box, and that's when I saw the butt of a gun" in Scott's waistband.

Johnny Holder testified that in November 1991, when he was thirteen years old, he agreed to sell a .22-caliber revolver to Pierce for $100. Holder delivered the pistol, but Pierce did not pay. On the night of December 6, 1991, Holder saw Scott and Springsteen at Northcross Mall. He told them to tell Pierce that he wanted his money. Holder identified the .22 pistol Pierce had in his possession when he was arrested on December 14, 1991, as the weapon he sold.

Guy Schumann testified that he saw Pierce with a small chrome semiautomatic pistol in the summer of 1991. Chris Lavas testified that he saw a revolver in Pierce's waistband in early 1992.

When being booked into jail following his arrest on October 6, 1999, Scott was asked a series of routine questions by the booking officer. One of these questions was whether he had ever considered suicide. The officer testified that Scott answered, "December 6, 1991."

Scott's defense was aimed at discrediting his statements to the police. To this end, defense counsel cross-examined the interrogating officers at length in an effort to demonstrate that they had led him to falsely confess through the misuse of various interrogation techniques. Scott also sought through his cross-examination of the State's witnesses to draw the jury's attention to the internal inconsistencies in his statements, and to the fact that some of the details contained in his statements were contrary to the known physical facts.

Scott also offered the testimony of Robert Shomer, a licensed clinical psychologist with expertise in the field of memory and perception. Shomer testified that memory is a process of

13

reconstruction based not only on actual perceptions, but also on inference and suggestion by others: "We reconstruct based on what we may have seen, what we assume we may have seen, what we think we may have seen, and in some cases what we want to see." Shomer testified that, contrary to statements made to Scott by police officers during his interrogation, memory is not like a video recorder. Shomer was of the opinion that it is unethical to tell a person, as the officers told Scott, that everything he has ever seen is recorded somewhere in his brain and can be retrieved by merely "unblocking" the memory. Shomer testified, "[I]f you adopt that theory of memory and somebody really believes it works that way . . . , then there is nothing really to guard against the creation of material based on inference and assumption." Shomer was also critical of "visualization," another technique used by Scott's interrogators. Shomer testified that visualization is "really imagination." He added, "When you ask somebody to put themselves in a particular place, although it may bring back some of the emotions involved in a situation, or it may create emotions on the spot, it's absolutely no guide to accurate memory. . . . [I]f you're interested in what really occurred, you don't want them to imagine anything, because you are asking them to create information, and that information becomes, through source confusion, mixed with whatever they may have seen."

### *Sufficiency of Evidence*

The jury found that Scott, acting alone or as a party, intentionally murdered Amy Ayers while in the course of committing or attempting to commit robbery or burglary. *See* Tex. Pen. Code Ann. § 19.03(a)(2). Scott contends the evidence is legally and factually insufficient to sustain the jury's verdict.

14

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981) (legal sufficiency); *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (factual sufficiency). In a legal sufficiency review, all the evidence is reviewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Griffin*, 614 S.W.2d at 159 (citing *Jackson*, 443 U.S. at 318-19). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed factually insufficient to sustain the conviction if the evidence of guilt, considered alone, is too weak to support a finding of guilt beyond a reasonable doubt, or if the strength of the contrary evidence precludes a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85.

The State's case rested primarily on Scott's statements to the police. Scott attacks the credibility of these statements, arguing in effect that they were the product of overbearing police interrogation. Scott points out that during his videotaped questioning, his description of the murders and the surrounding circumstances constantly evolved as he allegedly sought to please his

15

interrogators. Scott notes that he never accurately described the inside of the yogurt shop, first leaving out a wall and then adding a hallway. He first said that the victims were clothed, then said that they were partially naked, then fully naked. He said that the girls' hands were tied with an electric extension cord, then with napkins, then with shirts, or jeans, or undergarments. Scott variously suggested that the girls had been strangled, bludgeoned, kicked, knifed, and shot. Scott's statements did not clearly indicate who shot whom, or with what weapon. Scott inaccurately stated that one of the girls had been killed behind the shop counter.

There is also evidence that, on one occasion, the interrogation was contaminated when an officer suggested a critical fact. During the first day of interrogation, one of the officers asked Scott, "So one of the girls, you're saying, was shot twice?" In fact, Scott had said nothing about this up to that time, but he soon confirmed this fact for the officers.

Scott also challenges the credibility of his written statement. He notes several factual inaccuracies and inconsistencies in the statement. For example, he did not accurately describe the color of Pierce's car. He incorrectly stated that he could see the front of the yogurt shop from the back door, and that one of the girls was killed in the office. The statement is internally inconsistent with respect to whether Pierce or Springsteen handed Scott a pistol, and whether the pistol used by Scott was the .22 revolver or the .380 semiautomatic.

The errors and omissions in Scott's statements must be considered in light of the totality of the circumstances. Scott's own expert witness on memory, Robert Shomer, testified that a person in a highly emotional situation will have a narrower focus and therefore remember the event with less accuracy. He also testified that the use of drugs can adversely affect memory, and that

16

memories can degrade or become distorted with the passage of time. Scott told the police that he had been smoking marihuana and drinking on the day of the murders, and there is evidence that Scott had taken LSD. Add to this the chaotic scene inside the yogurt shop, and it is unsurprising that Scott, eight years later, would not recall these events with perfect clarity. It is also possible that some of Scott's apparent inability to remember these events accurately was a conscious attempt by him to deny or minimize his guilt.

It must also be considered that Scott's statements contained many accurate details. He knew that the front door of the yogurt shop was locked and that the key had been left in the lock. He also knew that the killers had entered the shop through the back door, which had been left open. Scott recalled hearing one of the girls tell Pierce that the money had been "dropped," that is, placed in the drop safe as described by the manager. He also described hearing someone slap one of the girls; this was consistent with the autopsy finding of a contusion on Amy Ayers's lower lip. Scott knew that a .22 revolver and a .380 semiautomatic were used in the murders, and he knew that five shots were fired. Although Scott said one of the girls had been killed in the office, he also said that she had been by the shop's safe, which in fact is where Ayers's body was found. Scott also told the police that Ayers was still alive after he shot her, a fact consistent with the autopsy findings.

Most tellingly, Scott described piling the bodies of three girls together in the middle of the storage area, covering them with flammable material, and setting them on fire. This accurate description of the origin of the fire could not have been the result of police suggestion because, at the time Scott was being questioned, it was believed that the killers had started the fire in the shelves along the wall. It was only after Scott gave his statements that another arson expert reexamined the

17

evidence and concluded that the fire had begun on the bodies as Scott described.[4] Recognizing the importance of this evidence, Scott's trial counsel spent hours cross-examining the State's arson experts in an effort to discredit their testimony. The defense did not, however, proffer any contradictory expert testimony.

The jury is the exclusive judge of the credibility of the witnesses and the weight to give their testimony, and the jury may accept or reject all or any part of the evidence. Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *see Bonham v. State*, 680 S.W.2d 815, 819 (Tex. Crim. App. 1984); *Castellano v. State*, 810 S.W.2d 800, 807 (Tex. App.—Austin 1991, no pet.). The jury in this cause saw all eighteen hours of Scott's videotaped questioning, heard several more hours of audiotaped questioning, and had the benefit of expert testimony on memory. Thus, it was in a position to assess the credibility of Scott's statements in light of the interrogation techniques employed by the police. The jury could rationally conclude that, despite the errors and inconsistencies in his statements, Scott's confession of guilt was true.

We hold that when all the evidence is considered in the light most favorable to the jury's verdict, a rational trier of fact could find all the essential elements of the charged offense beyond a reasonable doubt. We further hold that when all the evidence is considered neutrally, including the errors and inconsistencies in Scott's statements to the police and the circumstances in which those statements were made, the jury's finding of guilt beyond a reasonable doubt was not manifestly unjust. Points of error one and two are overruled.

---

[4] The second expert, Marshall Littleton of the ATF, testified that he had never read Scott's and Springsteen's statements to the police, and that his conclusions were based solely on the physical evidence.

18

### *Accomplice Witness*

Scott contends that Springsteen was an accomplice as a matter of law, that the district court erroneously failed to instruct the jury on the law of accomplice witness testimony, and that Springsteen's statement was not adequately corroborated. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979). It is settled, however, that article 38.14 applies only to an accomplice's in-court testimony; it does not apply to an accomplice's out-of-court statements. *Paredes v. State*, 129 S.W.3d 530, 538 (Tex. Crim. App. 2004); *Bingham v. State*, 913 S.W.2d 208, 211 (Tex. Crim. App. 1995). Points of error three and eleven are overruled.

### *Admission of Scott's Statements*

#### *Miranda and Article 38.22*

Scott contends that the admission in evidence of his oral statements to the police violated the Fifth Amendment of the United States Constitution and the due course of law provision of the Texas Constitution because he was not advised of his rights prior to the questioning. *See* U.S. Const. amends. V, XIV; Tex. Const. art. I, § 9; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2) (West Supp. 2004-05). He also contends that article 38.22 was violated by the admission of his unrecorded oral statements. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(1).

Scott does not separately argue his state constitutional claim, nor does he offer any argument or authority to suggest that the Texas Constitution offers greater protection than the Fifth Amendment in this context. Accordingly, we overrule the state constitutional claim, point of error six. *See Heitman v. State*, 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991).

19

The trial court overruled Scott's motion to suppress his statements in a written order containing findings of fact and conclusions of law.[5] The court concluded, among other things, that Scott was not in custody when he made the statements and therefore neither *Miranda* nor article 38.22 was applicable. *See Miranda*, 384 U.S. at 444 (applying procedural safeguards to custodial interrogation); Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (same). In our review of the trial court's ruling, we defer to the court's factual determinations but review de novo the court's application of the law to the facts. *Maestas v. State*, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

A person is in custody if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994). The custody determination is based entirely on the objective circumstances of the interrogation, and not on the subjective views harbored by either the interrogating officers or the person being questioned. *Id*. at 323. Station house questioning does not, in itself, constitute custody. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

The court of criminal appeals has outlined four general situations that may constitute custody in the absence of a formal arrest: (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

---

[5] The court's findings and conclusions are set out in the appendix to this opinion.

*Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Scott relies on the fourth of these situations. He argues that he was in custody from the moment when, on the first day of questioning, he initially admitted his involvement in the yogurt shop murders and thereby gave the police probable cause to arrest him.

We summarized the circumstances in which Scott's questioning took place during our discussion of the evidence. Scott was questioned for approximately twenty hours, but he does not contend and we are not referred to authority holding that lengthy questioning, in itself, establishes custody. Although length of questioning was one factor cited by the *Dowthitt* court to support its conclusion that the defendant in that case was in custody when he gave his incriminating statement, *see id*. at 257, the facts of that case are otherwise distinguishable. Dowthitt's questioning began at 9:00 a.m. and continued until well past midnight, his protestations that he was exhausted and his requests to see his wife were ignored, and, after he admitted being at the scene of the crime, he was told by a police officer that he was not going home. *See id*. at 252-54. Scott's questioning, on the other hand, took place in multiple sessions over a five-day period. Scott was never frisked or handcuffed, was allowed to take breaks during the interviews without being guarded, and was provided ample food and drink.[6] Although probable cause to arrest arose early in the questioning, the officers never suggested by word or deed that Scott was not free to leave. To the contrary, the officers took Scott home at the conclusion of questioning on September 9, and did so on every subsequent day on which he was questioned. On September 11, Scott was not questioned at all, but

---

[6] There is evidence that an officer would accompany Scott when he left the building to smoke a cigarette because he would not otherwise have been able to reenter the secure area where the interview room was located.

remained at home.[7] Scott was not merely told that he was free to leave after probable cause arose, he was repeatedly allowed to do so.

The district court's findings of fact are supported by the record. Based on those findings, the court correctly concluded that a reasonable person in Scott's position would not believe that his freedom of movement was restrained to the degree associated with a formal arrest. Because Scott was not in custody while being questioned, neither the failure to advise him of his rights nor the failure to record certain of the statements rendered the statements inadmissible under either the Fifth Amendment and *Miranda,* or under article 38.22, section 3. Points of error five and seven are overruled.

### *Voluntariness*

In his eighth point of error, Scott contends that all of his statements to the police, both oral and written, should have been suppressed because they were involuntarily made. A confession is involuntary or coerced if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will. *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991)). We determine whether a confession was voluntary under the due process clause of the Fourteenth Amendment by examining the totality of the circumstances surrounding its acquisition. *Armstrong v. State*, 718 S.W.2d 686, 693 (Tex. Crim. App. 1985).

---

[7] Scott's home was watched by the police on the chance that he might lead them to the murder weapon. This surveillance, of which Scott was unaware, did not constitute a restriction on Scott's freedom of movement.

We have already discussed some of the circumstances cited by Scott as supporting his claim that his confessions were coerced: the questioning was initiated by the police, extended over the course of several days, took place (for the most part) in a police interview room, and was not preceded by *Miranda* warnings. Scott also cites what he considers to be improper interrogation techniques employed by the officers: misrepresentations regarding the information in the officers' possession, repetitive and leading questions, verbal attacks that created a sense of fear, expressions of disbelief, and challenges to the contradictions in his statements.

The officers questioning Scott told him that Springsteen, Pierce, and Welborn had already revealed his role in the yogurt shop murders. This was not true. Misrepresentations by the police relating to a suspect's connection to the crime are not, however, considered likely to render a confession involuntary. *Green*, 934 S.W.2d at 100 (citing *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992)). Scott does not refer us to any example of a verbal attack by the officers and, with one exception discussed below, there is no evidence that he was ever frightened during his questioning. We have previously mentioned the only leading question cited by Scott: the officer's question asking Scott if he had said that one of the girls was shot twice. The officers did repeat questions, confront Scott with contradictions in his statements, and express their disbelief when Scott dissembled or claimed a loss of memory, but none of these tactics appears calculated to improperly overcome Scott's will.

The most serious incident to take place during Scott's questioning occurred on the second day. Officer Merrill testified that he and other officers decided to confront Scott with the .22 revolver Pierce was carrying when he was arrested two weeks after the murders. The officers

23

believed that the revolver might be the murder weapon and that showing it to Scott might "put him back in there mentally in that store with that gun in his hand" and "focus that memory on the events that happened."[8] The incident was captured on videotape. Scott asserts that the tape shows Merrill pointing the revolver at Scott's head. Merrill testified and the trial court found, however, that the gun, which was unloaded, was not pointed at Scott. Instead, the court found that Merrill first handed the gun to Scott. Then, while holding the weapon in his own hand, Merrill placed his finger at the back of Scott's head while asking, "Is that the gun you walked up behind somebody with and shot in the head? Is that the one?" Our review of the videotape confirms the trial court's finding.

This tactic did not have the desired result. After being shown the .22 revolver, Scott claimed that his mind was a blank. A few minutes later, he was given a thirty-minute break in questioning. When questioning resumed, Scott told Merrill, "You scared the shit out of me." Merrill replied, "I meant to scare the shit out of you." This is the only time during his questioning that Scott expressed fear.

While the officer's conduct was improper, the record supports the trial court's finding that the officer did not use the .22 pistol to threaten Scott, and that this incident did not coerce or terrorize Scott so as to cause him to make statements or submit to questioning against his will. As the court found, Scott had made many inculpatory statements before the incident with the revolver, and he thereafter voluntarily returned to the police station for further questioning.

---

[8] Ballistics tests of this weapon up to that time had been inconclusive regarding its use in the murders. Tests conducted after Scott confessed excluded it as the murder weapon. *See* fn. 2, *supra*.

24

A final circumstance cited by Scott is his use of medication for back pain during questioning. On September 9, Scott told the officers that he suffered from scoliosis and "my back knots up really bad." Scott said he had taken a muscle relaxant the day before. Scott does not refer us to any other evidence of physical discomfort or drug use during his questioning. There is no basis in the record for finding that Scott was either in pain or under the influence of drugs during his questioning by the police.

There is no question that Scott was subjected to hours of intense, vigorous questioning in a police interview room. The officers conceded that the questioning was exhausting, both for Scott and for themselves. But Scott was not physically forced to cooperate, was allowed numerous breaks during questioning, and was returned to his home at the close of each day's interview. Scott was not held incommunicado, isolated from his family or friends, or denied adequate rest or food. Although Scott was not expressly advised of his rights, there is evidence that he called an attorney from his home on September 13, 1999, but after speaking to the attorney elected to continue to meet with the officers.[9] Scott was waiting for the officers at his residence each morning, repeatedly expressed his desire to cooperate, and even agreed to speak to officers in his home. Considering the totality of the circumstances shown in this record, the district court properly concluded that Scott gave his statements to the police voluntarily. Point of error eight is overruled.

---

[9] Scott does not contend that his Fifth Amendment right to counsel was violated.

## Admission of Springsteen's Statement

### Crawford v. Washington

In point of error four, Scott urges that the admission in evidence of Springsteen's statement to the police violated his Sixth Amendment right to confront the witnesses against him. U.S. Const. amends. VI, XIV. We review the trial court's ruling de novo. *Muttoni v. State*, 25 S.W.3d 300, 304 (Tex. App.—Austin 2000, no pet.).

At the time of Scott's trial, the application of the Sixth Amendment to an out-of-court statement offered against the accused was governed by *Ohio v. Roberts*, 448 U.S. 56 (1980). Under *Roberts*, the admission of such a statement did not violate the Confrontation Clause if the statement fell within a firmly rooted hearsay exception or if it contained such particularized guarantees of trustworthiness that adversarial testing would be expected to add little to its reliability. *Id*. at 66.

While this appeal was pending, the United States Supreme Court announced its opinion in *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004). In that case, Crawford stabbed a man named Lee during an altercation that broke out after Lee allegedly tried to rape Crawford's wife. 158 L. Ed. 2d at 184-85. Both Crawford and his wife, who witnessed the incident, gave statements to the police. In his account, Crawford said that he saw something in Lee's hand. *Id*. at 185. Crawford's wife, questioned separately, said she did not remember seeing anything in Lee's hand. *Id*. At Crawford's trial for assault and attempted murder, his wife's statement was admitted to rebut his claim of self-defense after the trial court found that it was reliable under *Roberts*. *Id*. at 186.

In its opinion, the Supreme Court reviewed the Sixth Amendment's historical background and reached two conclusions. First, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id*. at 192. Second, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id*. at 194. The Court stated that the *Roberts* "indicia of reliability" standard departed from these principles in two respects: (1) it was too broad, in that it applied the same mode of analysis whether or not the hearsay consisted of ex parte testimony; and (2) it was too narrow, in that it admitted statements that constituted *ex parte* testimony upon a mere finding of reliability. *Id*. at 198. The Court added:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." . . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

*Id*. at 199. The Court disapproved the continued use of the *Roberts* reliability test to determine the admissibility of testimonial hearsay. "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id*. at 203. The Court declined to spell out a comprehensive definition of "testimonial" but said that "it applies at a minimum to prior testimony at a preliminary hearing,

27

before a grand jury, or at a former trial; and to police interrogations." *Id.* The Court held that Crawford's Sixth Amendment confrontation right was violated by the introduction of his wife's testimonial statement to the police. *Id.*

There is no question that Springsteen's statement was "knowingly given in response to structured police questioning" and hence the product of police interrogation.[10] *Id.* at 194 n.4. Nevertheless, the State argues that Springsteen's statement was not testimonial under *Crawford* because it was not "accusatory." Noting that the word "accuse" or some variation of it appears over twenty times in *Crawford*, the State urges that a declarant must have a motive to accuse and must actually accuse the defendant of a criminal act for the declarant's statement to be considered testimonial. The State claims to find support for this position in the text of the Sixth Amendment, arguing that the Confrontation Clause does not attach unless the declarant's statement is used "against" the accused, which the State equates to an accusation of criminal conduct. Because Springsteen's statement to the police had been redacted to omit any reference to Scott, the State concludes that it was not accusatory and that its introduction in evidence did not make Springsteen a witness against Scott within the meaning of the Sixth Amendment.

A flaw in the State's argument is that Crawford's wife's statement was not accusatory within the State's proposed definition: she did not accuse her husband of a crime and there is no suggestion that she had intended to do so. Recognizing this, the State argues that the wife's statement "was being offered against [Crawford] because it described [Crawford's] behavior during

---

[10] Springsteen was not in custody when he spoke to the police, but *Crawford* does not distinguish between custodial and noncustodial interrogation. The State does not argue that such a distinction should be drawn.

28

the crime and directly contradicted one of [Crawford's] statements; it was used to disprove the one fact that could exculpate [Crawford]." But the State used Springsteen's statement in a similar manner: to corroborate Scott's own statements and thus to rebut Scott's defensive theory that his confession was the unreliable product of police overreaching. Although Springsteen's statement had been redacted to remove any reference to Scott, the State used the statement against Scott just as surely as the prosecutors used Crawford's wife's statement against Crawford.

The State also claims that its reading of *Crawford* is supported by the opinion in *Williamson v. United States*, 512 U.S. 594 (1994). At issue in *Williamson* was the scope of the federal hearsay exception for statements against penal interest. *Id*. at 596; Fed. R. Evid. 804(b)(3); *see* Tex. R. Evid. 803(24). The Supreme Court held that the rule authorizes the admission of only those declarations or remarks within a larger statement that are individually self-inculpatory; the rule does not permit the introduction of the non-self-inculpatory parts of a statement. *Williamson*, 512 U.S. at 599. The Court emphasized that while the rule does allow the admission of third-party statements that inculpate a criminal defendant, such statements, to be admissible, must be truly self-inculpatory and not merely attempts to shift blame or curry favor. *Id*. at 603. As an example of an admissible statement against penal interest, the Court posited a statement to the police that, on its face, inculpates only the speaker, but which, given the circumstances, also inculpates the defendant. *Id*.

The Court in *Williamson* expressly did not address the defendant's claim that the statements at issue were inadmissible under the Confrontation Clause. *Id*. at 605. We cannot accept the State's assertion that *Williamson* is a Sixth Amendment case and that the examples it uses to

29

illustrate the proper application of the evidence rule also inform the meaning of "testimonial," as that term is used in *Crawford*. It is true that "hearsay rules and the Confrontation Clause are generally designed to protect similar values." *California v. Green*, 399 U.S. 149, 155 (1970). But "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence." *Crawford*, 158 L. Ed. 2d at 199. The question of whether a statement is testimonial within the meaning of the Sixth Amendment and *Crawford* does not turn on whether it is self-inculpatory within the meaning of the hearsay exception for statements against penal interest.[11]

Just as *Roberts* substituted a trial judge's reliability determination for cross-examination, the State would substitute a trial judge's determination that the statement was not accusatory. But the State's labored effort to define a testimonial statement in terms of what is said ignores *Crawford*'s teaching that the Confrontation Clause "is a procedural rather than a substantive guarantee" that commands that evidence be tested "in the crucible of cross-examination." *Id*. The Supreme Court's examples of testimonial statements clearly reflect that it is the circumstances in which the statement is made, not its content, that is determinative. *Id*. at 203 (term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations").

We believe that *Crawford* means what it says: statements made during police interrogations are testimonial, and like other testimonial statements, they are admissible under the

---

[11] Because we conclude that the admission of Springsteen's statement violated the Sixth Amendment, we do not reach Scott's further contention that it was erroneously admitted as a statement against penal interest. Tex. R. Evid. 803(24).

Sixth Amendment only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine. *Id*. Springsteen's statement to the police was no less testimonial because it had been redacted to remove all references to Scott.[12] Because Scott had no prior opportunity to cross-examine, the introduction of Springsteen's testimonial statement violated Scott's Sixth Amendment right to confront the witnesses against him.

A recent opinion by the Fort Worth Court of Appeals is consistent with our holding in this cause. *See Hale v. State*, 139 S.W.3d 418 (Tex. App.—Fort Worth 2004, no pet.). In *Hale*, the defendant unsuccessfully moved to suppress his accomplice's statement to the police on Sixth Amendment grounds. *Id*. at 420. The statement had been redacted to delete the defendant's name, although references to the defendant's conduct remained. *See id*. n.1. Without expressing any opinion regarding the effect of the redaction, the appellate court held that the statement was inadmissible under *Crawford*. *Id*. at 422.

---

[12] The Sixth Amendment issue raised in this cause should not be confused with the similar issue addressed by the *Bruton* line of authority. Under *Bruton*, the introduction at a joint trial of a nontestifying co-defendant's facially incriminating out-of-court statement violates the other defendant's Sixth Amendment confrontation right even if the jury is instructed to consider the statement only against the co-defendant. *Bruton v. United States*, 391 U.S. 123, 135-36 (1968). The Confrontation Clause is not violated, however, if the co-defendant's statement is redacted to remove any reference to the other defendant and the jury is instructed not to consider the co-defendant's statement in determining the other defendant's guilt. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). The issue before us is not whether Springsteen's redacted statement could have been introduced *against Springsteen* at a joint trial with Scott, but whether Springsteen's statement was admissible *against Scott* at Scott's trial.

31

*Harm Analysis*

Confrontation Clause violations are subject to harmless error analysis. *See Lilly v. Virginia*, 527 U.S. 116, 140 (1999); *Harrington v. California*, 395 U.S. 250, 254 (1969). If an appellate court finds constitutional error subject to harmless error review, it must reverse unless it determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a) (incorporating holding in *Chapman v. California*, 386 U.S. 18, 24 (1967)). If there is a reasonable likelihood that an error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (citing *Satterwhite v. Texas*, 486 U.S. 249 (1988)).

In a harmless error review, the focus is not on the propriety of the outcome of the trial. *Id.*; *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). Instead, the appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence. *Wesbrook*, 29 S.W.3d at 119; *Harris*, 790 S.W.2d at 587. Thus, the court should examine the source of the error, the nature of the error, and the extent to which it was emphasized by the State. *Harris*, 790 S.W.2d at 587. The court should also determine whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.*

Because there was no physical evidence linking Scott to the yogurt shop murders, the question of his guilt or innocence turned on whether the jury believed or disbelieved his statements to the police. Springsteen's testimonial statement to the police, edited down to a short, five paragraph summary describing Springsteen's conduct on the night of the murders, was offered and

32

admitted to corroborate Scott's statements and thus to rebut Scott's defensive claim that his statements were unreliable and untrue.

We would not hesitate to reverse this conviction if Springsteen's statement were the only corroboration of Scott's statements to the police. But as we have already discussed with regard to the sufficiency of the evidence, Scott's statements contained many details regarding the murders that were consistent with the physical evidence: he knew that the front door of the yogurt shop was locked and that the key had been left in the lock; he knew that the killers had entered the shop through the back door, which had been left open; he heard one of the girls tell Pierce that the money had been "dropped"; he heard someone slap one of the girls, a fact confirmed by the finding of a contusion on Amy Ayers's lower lip; he knew that a .22 revolver and a .380 semiautomatic were used in the murders, and he knew that five shots were fired; he told the police that Ayers was still alive after he shot her, a fact consistent with the autopsy findings.

The most critical corroborating fact, and the one most damaging to Scott's defense, was his description of how the bodies of three girls were piled together in the middle of the storage area, covered with flammable material, and set on fire. At the time Scott was being questioned, it was believed that the fire started in the shelves along the wall of the storage area and that the bodies were damaged by thermal heat, not direct flame. It was only after Scott gave his statements that arson experts reexamined the evidence and concluded that the fire began as Scott described. Under the circumstances, Scott's accurate description of the fire's origin could not be the product of intentional or unintentional police suggestion. And it is very unlikely that it was simply a guess.

33

Scott's statements were corroborated in other ways. Scott said that he and his companions decided to commit a robbery because Pierce needed money, a fact corroborated by testimony that Pierce owed money for a pistol. A witness saw Scott with a pistol on the night of the murders and described the odd behavior of Scott and his companions. Other witnesses saw Scott in possession of handguns around the time of the murders, or heard Scott make incriminating statements soon after the murders. Scott's account of the trip to Helotes in the stolen Pathfinder was corroborated by the testimony of his friend from orchestra camp.

The credibility of Scott's statements dominated the jury arguments of both the prosecutors and defense counsel. Springsteen's statement, however, was not mentioned until the close of the State's argument, when one of the prosecutors addressed the similarities between Scott's statements and Springsteen's statement. We quote the argument in full:

> So Michael Scott gives his confession to police and as [Officer] Chuck Meyer says, we still have homework to do. So they go to West Virginia and they talk to Robert Springsteen who has not been in Austin since 1992, early part of 1992. And the tactics that were employed — sitting in his room silently for 10 or 12 minutes waiting for him to decide to confess. That's the tactics you heard about, among others obviously.

> Michael Scott's written statement about the newspaper in the Pathfinder — I'll let you read that when you get back in the jury room. But he talks about it. Robert Springsteen's interview. Robert Springsteen remembered he bought a newspaper and read it in a stolen Pathfinder on the way to San Antonio.

> We got to go back through the question that led to this response.[13] They just asked him: Do you remember a Pathfinder? He said, we went to San Antonio and

---

[13] Although the videotape of Springsteen's statement was not admitted in evidence before the jury, Scott's counsel was permitted to admit brief portions of the interview during cross-examination to support his claim that Springsteen was also the victim of improper interrogation techniques.

34

as a matter of fact bought a newspaper on the way down. Bought it Sunday morning before 6 a.m. That came from Robert Springsteen without being fed information by the police. It's in the record.

. . . .

Thank you. I'm running out of time, so you know what Michael Scott says about the restroom, how they went in, opened up the back door, left it ajar so they could come back. Robert Springsteen in West Virginia, a completely different state, who hasn't been talked to by the police en route to the police department, whose entire confession up there is on videotape, says that they went into the yogurt shop prior to the robbery, opened up the back door so they had a way to get in.

The question that elicited that response was [Officer] Robert Merrill saying: You just remembered. I saw your head move. Tell me about it.

Answer by Mr. Springsteen: At some point in time, came through the back door, opened up the back door. Says he went through the front door, went to the bathroom. When no one was looking, he unlocked it and opened the back door, used a folded pack of cigarettes or rock to keep the door from shutting all the way.

Michael Scott's written statement talks about coming back in through the back door. Robert Springsteen, same thing in West Virginia the next day. So at some point in time he went back that evening, came in through the back door.

Michael Scott's written statement about sexual assault. Robert Springsteen's interview — that's okay. We can just leave that one right there.

Robert Springsteen's interview. Michael Scott has described this gun as a James Bond gun, a small semiautomatic. And you saw one here in court. Very small, equivalent of a nine millimeter, will fit in the palm of your hand. Michael Scott calls it a James Bond gun. Robert Springsteen said it's a silver .380. That information was a closely guarded fact in this investigation. Robert Springsteen knows the answer to that question.

Said Amy was shot or he described the person he shot as she was crawling, screaming and crying. Are you going to tell me based on all that information in the corner over there by the office wall that anybody can say that she didn't flop around and she never crawled?

Michael Scott's statement about going to a bridge and throwing up. Robert Springsteen, same thing in West Virginia. The questions that elicited this response from Robert Springsteen were: Where did you drive to? He said . . . . There is a

35

bridge, a little stream over there by the yogurt shop. What did you do? He mentions that he threw up. These facts are not suggested to him. That, ladies and gentlemen of the jury, right there is a neutral fact. A neutral fact that only these two people know.

As you wade through the evidence, I have some objective facts for you. I have some objective facts for you. Michael Scott describing the body positions, two girls like this. One girl laying on top. Robert Springsteen talking about the girl that he killed. Those are objective facts. That's information right there, ladies and gentlemen, that only the people who committed this offense could know.

Stay in there as long as you have to. If somebody decides that they have a problem with this case, you get them to explain these two pieces of information, and that piece of information in the middle where they both know about going to a bridge and throwing up.

These remarks take up four pages in the record; the State's argument as a whole is seventy-seven pages long. It would be impractical to quote all of the argument that dealt with the other corroborating evidence because, in essence, the State's entire argument was devoted to that evidence.

The jury watched all eighteen hours of Scott's videotaped statements, heard several hours of tape-recorded oral statements, and read Scott's written statement. By contrast, the jury was not shown Springsteen's videotaped statement to the police but heard only the brief, redacted version that did not mention Scott. While the redaction did not render the statement admissible under *Crawford*, we do believe under the circumstances that it served to reduce the harm resulting from the statement's erroneous admission. Because of the redaction, Springsteen's statement did not *expressly* implicate Scott as implied by the dissent.

The wealth of accurate physical detail contained in Scott's statements, Scott's knowledge of how and where the fire began, and the testimony describing Scott's conduct and statements near the time of the murders overwhelmingly support a finding that Scott's statements

are true. *See Wesbrook*, 29 S.W.3d at 119 (overwhelming evidence supporting finding in question is relevant factor in harmless error analysis). Moreover, the jury was able to assess Scott's credibility for itself as it watched the eighteen hours of videotaped police questioning. We are satisfied from an examination of the record as a whole that there is no reasonable possibility that the admission of Springsteen's statement moved the jury from a state of nonpersuasion to one of persuasion with regard to the credibility of Scott's confession of guilt. *See id.* And because the credibility of Scott's confession was the crucial issue in this case, we are thus convinced that the erroneous admission of Springsteen's statement did not materially affect the jury's deliberations.

We also note that the error arises out of the change in the law announced by the Supreme Court in *Crawford* after Scott's trial. The record reflects that the trial court, with the full support of the prosecutors, made every effort to comply with the *Roberts* standard that was in effect at the time of trial. We have no reason to believe that the trial court or the State will in the future be any less dedicated to fully complying with *Crawford*, and therefore we are confident that declaring the error harmless will not encourage the State to repeat it with impunity.

We determine beyond a reasonable doubt that the erroneous admission of Springsteen's testimonial statement to the police did not contribute to the conviction or punishment. Point of error four is overruled.

### *Other State Witnesses*

Scott complains of the admission of testimony from seven State witnesses. He urges that the testimony was either irrelevant, unfairly prejudicial, or improper character-conformity

37

evidence. The trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g).

Evidence is relevant if it has any tendency to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence. Tex. R. Evid. 401. Broadly speaking, all relevant evidence is admissible. Tex. R. Evid. 402. Relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made on an improper basis, commonly, but not necessarily, an emotional one. *Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). Factors that should be considered in applying rule 403 are the probative value of the evidence, the potential of the evidence to impress the jury in some irrational way, the time needed to develop the evidence, and the proponent's need for the evidence. *Montgomery*, 810 S.W.2d at 389-90.

Evidence of other crimes, wrongs, or acts is not admissible to prove the defendant's character in order to show action in conformity to that character. Tex. R. Evid. 404(b). This rule incorporates the fundamental tenet of our criminal justice system that an accused may be tried only for the offense of which he is accused and not for his criminal propensities. *Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996). A defendant may not be tried for some collateral crime or for being a criminal generally. *Williams v. State*, 662 S.W.2d 344, 346 (Tex. Crim. App. 1983).

**Sarah Adair.** Adair testified that she saw Scott with a black revolver and a "silver, smallish gun" in December 1991 or January 1992. Scott contends this testimony was more prejudicial than probative because it was not credible. He notes that Adair did not reveal this

information when she was questioned by the police soon after the murders, but only after Scott was arrested. He also points to the absence of any corroborating evidence and the inconsistency between Adair's testimony and other evidence in the case. Scott did not voice a rule 403 objection to Adair's testimony about the guns; his only trial objection was that the testimony was irrelevant. *See* Tex. R. App. P. 33.1(a) (preservation of error); Tex. R. Evid. 103(a)(1) (same).

Evidence that, at or about the time of the murders, Scott was in possession of handguns similar to those he described in his statements to the police was clearly relevant. Moreover, Adair's description of a "silver, smallish gun" was consistent with the testimony of a firearms expert who testified that the .380 bullet recovered at the scene of the murders was fired by an AMT Backup, a small silver-gray semiautomatic pistol. The trial court did not abuse its discretion by overruling Scott's objection to the relevance of Adair's testimony. Any inconsistencies between her testimony and that of other witnesses went to the weight of the evidence, not its admissibility, and was a matter for the jury to resolve. There is no basis in the record for concluding that Adair's testimony was unfairly prejudicial, even if that contention had been preserved for review.

**Amanda Statham and Nancy Reed.** Statham testified that she visited Scott at his house shortly after the murders. Welborn was leaving as she arrived, and she heard Scott tell him to "keep his fucking mouth shut." On another occasion, Statham asked Scott why the police had been talking to him. Scott answered "kind of like, yeah, we shot them and raped them and blah, blah, blah. Kind of like half bragging, half joking, half—I don't know." Statham told her mother,

39

Reed, what Scott had said. Reed testified that she told her daughter that Scott "was just trying to scare her."

Scott argues that this testimony was irrelevant or, alternatively, more prejudicial than probative. Scott did not object to the testimony on either ground, however, and therefore did not preserve these contentions for review. In any event, Scott's argument that he may have been speaking to Welborn about a matter other than the murders goes to the weight of the testimony, not its admissibility. The same can be said of Scott's suggestion that he was merely joking with Statham. We find no abuse of discretion in the admission of Statham's and Reed's testimony.

**Chandra Morgan.** Morgan testified that she was with Pierce, Welborn, and Scott at Northcross Mall on the night of December 6, 1991. At some point, they took LSD, went to the yogurt shop, and then returned to the mall to play games in the arcade. Later that night, she saw Pierce, Springsteen, and Scott in a car outside the mall. They asked her if she had seen Welborn. Just then, Welborn walked into view from the direction of the yogurt shop. Welborn and Morgan got in the car and they began driving south from the mall. When they met several fire trucks traveling north, Morgan's companions became very quiet. They drove to an elementary school playground, where Morgan noticed that Scott had a gun in his waistband.

Scott concedes that Morgan's testimony was relevant, but he urges that its probative value was outweighed by the danger of unfair prejudice. Once again, Scott did not voice this objection at trial. And once again, Scott's argument reduces to a challenge to the witness's credibility, which was a matter for the jury to decide. The trial court would not have abused its discretion by admitting Morgan's testimony over a rule 403 objection.

40

**Johnny Holder.** Holder testified that he sold a .22-caliber revolver to Pierce for $100 in November 1991. Scott contends this testimony was irrelevant and unfairly prejudicial because the evidence shows that the gun Holder sold to Pierce was not the murder weapon. He also urges that this testimony was "an effort to bad mouth Scott's friends so as to tar him with the same brush." Scott objected to Holder's testimony on rule 401 and 403 grounds, but did not voice a rule 404(b) objection.

Although Pierce was not on trial, he was one of the actors named by Scott in his statements to the police. Even if the weapon Holder sold to Pierce was not used at the yogurt shop, his testimony was some evidence of Pierce's interest in weapons of the sort used to commit the murders. Holder also testified that Pierce did not pay him when he delivered the pistol, and that he had demanded payment when he met Scott and Springsteen at Northcross Mall on the night of the murders. This testimony was relevant in light of Scott's statement that he and his companions initially planned a robbery because Pierce was in need of money. The trial court did not abuse its discretion by ruling that Holder's testimony was relevant and that its probative value was not outweighed by the danger of unfair prejudice.

**Guy Schumann and Chris Lavas.** Schumann testified that he saw Pierce with a small chrome semiautomatic pistol in the summer of 1991. Lavas testified that he saw a revolver in Pierce's waistband in early 1992. Scott argues that this testimony was irrelevant other than to show the bad character of one of his associates.

Evidence that Pierce was seen at or about the time of the murders in possession of a revolver and a small semiautomatic pistol had relevance beyond mere character conformity. Like

Holder's testimony, it showed that Pierce had access to weapons similar to those used to commit the murders. Lavas's statement that Pierce threatened him with one of the pistols was made during voir dire outside the jury's presence, and this fact was not admitted before the jury after the court sustained Scott's rule 404(b) objection. No abuse of discretion is shown.

Finding no abuse of discretion in the admission of the challenged testimony, we overrule point of error ten.

### *Exclusion of Defense Testimony*

Scott contends he was denied his constitutional right to present a defense when the trial court excluded expert testimony supporting his defensive claim that his statements to the police were false. Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the United States Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). This right is violated by the exclusion of competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. *Id*. The trial court excluded the testimony in question after concluding that it was unreliable and hence inadmissible under evidence rule 702. Tex. R. Evid. 702; *see Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). We review the court's ruling for an abuse of discretion. *Kelly*, 824 S.W.2d at 574.

Outside the jury's presence, Scott proffered the testimony of Richard Leo, a professor of social psychology and criminology at the University of California at Irvine. Leo testified that his

area of expertise was "coercive persuasion or extreme influence in decision-making."  Leo has studied police interrogation techniques and false confessions, and he has  authored or coauthored numerous articles in professional journals on this subject.[14]  According to Leo, the psychology of interrogation and confession is a recognized area of social scientific study.

Leo stated that modern police interrogation "is premised on the notion that the person is guilty, that they will deny their guilt, and that you need to use psychological techniques to break down their denials and change their perceptions so that they come to see it as in their self-interest to make an admission."  Leo described a two-part model for interrogation.  First, the interrogators seek to break down the suspect's confidence and his ability to deny his guilt.  This is accomplished by isolating the suspect and building a rapport between the suspect and the interrogators, and then accusing the suspect and attacking his denials as implausible, impossible, or inconsistent with existing evidence.  Second, the interrogators motivate the suspect to believe that it is in his self-interest to confess.  To do this, interrogators may appeal to morality, describe a scenario of the crime in which the suspect is the least culpable actor, or suggest that the suspect will be treated more harshly by the criminal justice system if he persists in denying his guilt.

Leo testified that modern interrogation techniques are not designed or intended to produce false confessions but that they can nevertheless lead an innocent person to confess, particularly if the interrogator relies too heavily on "very high pressure interrogation techniques."

---

[14] For example, *see* Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. Crim. L. & Criminology 429 (1998); Richard J. Ofshe & Richard A. Leo, *The Decision to Confess Falsely: Rational Choice and Irrational Action*, 74 Denv. U.L. Rev. 979 (1997).

Leo posited three types of false confessions: (1) the voluntary false confession, in which an innocent person comes forward on his own volition and confesses; (2) the compliant false confession, in which an innocent suspect confesses in order to escape the pressures of interrogation or to receive some suggested benefit; and (3) the persuaded or internalized false confession, in which an innocent suspect comes to believe during the course of interrogation that he is guilty but has forgotten his criminal actions and thereafter makes good faith guesses or inferences about how and why he committed the crime. According to Leo, the persuaded false confession is the rarest form of false confession.

Leo said that it is impossible to determine whether a particular confession is true or false just by looking at the interrogation techniques that produced the confession. Instead, one must examine the "post-admission narrative," that portion of the interrogation after the person admits guilt, to determine whether or not the narrative contains details that the true perpetrator would be expected to know and that are consistent with the known facts. Leo testified that it is not currently possible to know how many confessions are false, and he agreed that the great majority of confessions are true.

At the conclusion of the proffer, the court announced that it would allow most, but not all, of the proffered testimony. The court's ruling, which was later reduced to writing, admitted Leo's testimony with regard to: (1) the two-step model of modern police interrogation; (2) the intent of the interrogation process, and how it does and does not work; (3) the interrogation techniques taught by Reid and Associates, a leading police training firm; (4) the misuse of interrogation techniques that can cause innocent persons to confess; and (5) the fact that interrogation techniques

44

can lead to false confessions even when used properly. The court ruled that Leo would not be allowed to testify with respect to: (1) the post-admission narrative; (2) the types of false confessions, including persuaded false confessions, and the mental processes through which suspects progress; and (3) his opinion that any particular interrogation technique is coercive or would render a confession involuntary. Rather than accept the court's limitations on Leo's testimony, the defense elected not to call him as a witness.

On appeal, Scott complains only of the exclusion of Leo's testimony regarding persuaded false confessions. He argues that Leo's description of how an innocent person can come to believe that he is guilty and then create a false narrative describing his assumed guilty conduct mirrors the process, shown in the videotaped interrogation sessions, by which he came to confess his guilt of the yogurt shop murders. Scott contends that the court's exclusion of this testimony went to the very heart of his defense.

A qualified expert may testify regarding scientific, technical, or other specialized knowledge if the trial court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. Tex. R. Evid. 702. The proponent of scientific or technical testimony has the burden of demonstrating by clear and convincing evidence that the proffered testimony is both relevant and reliable. *Kelley*, 824 S.W.2d at 572-73; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590-92 (1993). When determining the reliability of testimony addressing the social sciences or other fields of study based primarily on experience and training, the appropriate questions are: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether

the expert's testimony properly relies on or utilizes the principles involved in the field. *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998). Factors that may affect the trial court's determination of reliability include: (1) the extent to which the underlying theory is accepted as valid by the relevant scientific or technical community; (2) the qualifications, experience, and skill of the testifying expert; (3) the existence of literature supporting or rejecting the underlying theory; and (4) the potential rate of error. *Kelly*, 824 S.W.2d at 573.

In its written order, the district court explained its ruling:

> While this ruling may appear to be hairsplitting, it was designed in the Court's view to maximize the proponent's arguably legitimate use of the witness while restricting the witness from inappropriate areas. The limitation excluded areas where his novel science appears unproven and essentially untested, where he appeared to be exceeding his true area of expertise or sought to use terms of significant legal consequence that could confuse or mislead the jury, or where his testimony would not be of assistance to the trier of fact.

> When the Court reviewed all material provided by the parties on this issue, the one clear impression left is that the area of false confessions during police interrogation is an area of study in its infancy with different views and countervailing opinions. There is a significant lack of empirical studies and those that exist are not specifically involved with actual police interrogation or appear not to be objective or complete.

> . . . .

> . . . Leo was allowed to describe the techniques of interrogation and to state that the innocent do sometimes confess as well as the guilty. The Court's problem is with Leo's willingness to testify that the modern tactics lead ordinary people to confess during interrogation under normal circumstances and that these folks come to believe that they are actually guilty and keep these beliefs perhaps for quite some time. How does he know that? If there are examples of these occurrences, were the confessors analyzed by psychiatrists or other mental experts to eliminate the possibility of mental disease or defect? How do we know they were normal? Were the interrogations videotaped to insure that physical or other coercive tactics were not used? How often does it occur, if at all? Without this type of significant detailed

46

analysis, how can an expert state that regular people leave interrogations truly believing they committed terrible acts when they have done nothing?

Both in open court and in its written order, the court cited studies, acknowledged by Leo during his questioning, criticizing his methodology, stating that the study of false confessions has yet to produce scientifically reliable conclusions, or making less sweeping judgments regarding the likelihood of an innocent suspect falsely confessing.[15] Leo, who is not a clinician, did not cite any studies or otherwise explain how he knew or was qualified to state that a person of normal intelligence and suffering no mental disease or defect could come to believe, during interrogation, that he is in fact guilty of a crime. Leo had never met Scott and did not suggest that Scott was particularly susceptible to making a persuaded false confession.

Even if a trial court determines that proffered expert testimony is reliable, it may decide that, on balance, the testimony would be unhelpful to the trier of fact for one or more of the reasons identified in evidence rule 403. *Kelly*, 824 S.W.2d at 572; *see* Tex. R. Evid. 403. In this case, the same considerations that led the trial court to doubt the reliability of Leo's testimony regarding persuaded false confessions led the court to believe that the probative value of the testimony was outweighed by the danger of unfair prejudice, confusion of the issues, and delay. The court also concluded that Leo's testimony was cumulative of the testimony of Scott's memory

---

[15] For example, *see* Paul G. Cassell, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction From False Confessions*, 22 Harv. J.L. & Pub. Pol'y 523 (1999) (criticizing methodology); James R. Agar, II, *The Admissibility of False Confession Expert Testimony*, 1999 Army Law. 26 (concluding that false confession expert testimony not yet reliable); Welsh S. White, *False Confessions and the Constitution: Safeguards Against Untrustworthy Confessions*, 32 Harv. C.R.-C.L. L. Rev. 105 (1997) (stating that interrogation techniques are most likely to produce false confessions when used on certain especially vulnerable suspects).

expert, Robert Shomer, who criticized several of the techniques the interrogating officers had used to stimulate Scott's memory and testified that the use of these techniques could result in memory creation.

The study of interrogation techniques and false confessions has been recognized by some courts as scientifically legitimate, and these courts have, to varying degrees, admitted expert testimony on this subject. *See*, *e.g.*, *United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997) (admitting testimony by Leo's colleague, Richard Ofshe); *Franks v. State*, 90 S.W.3d 771, 805 (Tex. App.—Fort Worth 2002), *pet. ref'd, untimely filed*, 97 S.W.3d 584 (Tex. Crim. App. 2003) (discussing Leo's trial testimony). *But see Ruckman v. State*, 109 S.W.3d 524, 530 (Tex. App.—Tyler 2000, no pet.) (holding that defendant did not meet burden of showing scientific reliability of proffered testimony). In this cause, the trial court effectively recognized the legitimacy of this field of social scientific study by ruling that most of Leo's proffered testimony was admissible. The narrow question before us is whether the trial court abused its discretion by excluding Leo's proffered testimony regarding the categories of false confessions, and particularly persuaded false confessions.

The trial court was the sole judge of the weight and credibility of the evidence presented at the "gatekeeper" hearing. *Kelly*, 824 S.W.2d at 574. Our review of the record persuades us that the court's decision to admit most, but not all, of Leo's proffered testimony, and particularly the court's decision to exclude the proffered testimony regarding persuaded false confessions, was within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 391 (Tex. Crim. App. 1991) (op. on reh'g); *see Kelly*, 824 S.W.2d at 574. On this record, we cannot

state that the court abused its discretion by concluding that Scott failed to demonstrate by clear and convincing evidence that the excluded testimony was reliable and would assist the trier of fact to determine a fact in issue. Point of error nine is overruled.

## *Conclusion*

The evidence is legally and factually sufficient to sustain the jury's verdict. The admission of Springsteen's testimonial statement to the police violated Scott's Sixth Amendment confrontation right, but the error was harmless beyond a reasonable doubt. No other error is presented. We affirm the judgment of conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear: Opinion by Justice Puryear;
    Dissenting Opinion by Chief Justice Law

Affirmed

Filed: March 24, 2005

Publish

*Appendix*

**District Court's Findings of Fact and Conclusions of Law
Regarding Admissibility of Scott's Statements to the Police**

Findings of Fact

1. Michael Scott was questioned by Austin police officers several times from September 9, 1999 through September 21, 1999; specifically on September 9, September 10, September 12, September 13, September 14, September 17, September 19 and September 21.

2. The methods used to preserve these conversations and interrogations varied — some were unrecorded, some videotaped, some audiotaped, and one written out and signed by Scott.

3. The defendant was not placed under arrest on any of these occasions, nor was he frisked or handcuffed.

4. The defendant was not physically forced in any way to accompany the officers on any of the aforementioned dates.

5. On each occasion, the defendant was allowed to leave and return home at the close of the day's interview.

6. The defendant was allowed smoke breaks on his own and was free to come and go throughout the interviews without being guarded by police officers.

7. On some occasions the defendant accompanied the officers out to lunch at restaurants during the day's questioning.

8. During the interview of September 9 the defendant mentioned his possible need of a lawyer and discussed this with the officers [citation to transcript of interview]. The defendant never made an unequivocal request for counsel and continued with the interview.

9. During the September 10 interview, Officer Merrill possessed a handgun in the interview room with Scott present. The weapon was unloaded and was handled by both Merrill and the defendant. Merrill had the weapon in his hand, but not pointed at the defendant, when he pointed a finger at defendant's head from the rear. The weapon was not used in a threatening manner, and there is no evidence that it coerced or terrorized the defendant or led him to make statements or submit to further questioning against his will. He had, in fact, made many inculpatory admissions prior to this incident. Scott orally stated that he was cooperating with officers voluntarily, and in fact returned on several subsequent occasions to confer with officers.

50

10. On September 10 & 12 when officers went to pick the defendant up, he was waiting on the side of the main road some ½ mile from his home, and the officers stopped at a convenience store so the defendant could make purchases.

11. On September 13 the defendant agreed to talk with officers at his home. When the officers' recorder malfunctioned, Scott attempted to assist them by providing batteries.

12. On September 13 & 14 Scott told officers he had spoken with attorney Betty Blackwell for advice but didn't need an attorney and would continue cooperating with officers.

13. On September 14, Scott met officers at Grandy's restaurant as planned and accompanied them to police offices. For the first time he was read Miranda rights, and a written statement was taken.

14. There is no evidence that the defendant was tricked, coerced, threatened, mistreated, brainwashed, hypnotized or deceived, either during taped interviews, or in unrecorded conversations with police officers.

15. The defendant had the mental capacity to understand his situation and to choose to participate in the interviews conducted in September, 1999 of his own free will.


Conclusions of Law

1. The defendant, Michael Scott, was not in custody at any time during the interviews conducted throughout September of 1999. A custody determination depends entirely upon the objective circumstances of the interrogation. A person is in custody only if, under the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 244 S. Ct. 1526 (1994); *Dowthitt v. State*, 931 S.W.2d 244 (Tex. Crim. App. 1996); *Stahle v. State*, 970 S.W.2d 682 (Tex. App.—Dallas 1998 [pet. ref'd]). Based on the facts outlined above, no reasonable person could believe he was under arrest during any of the several interviews conducted with the defendant in September, 1999.

2. Because the defendant was not in custody, there was no violation of *Miranda v. Arizona* or [Tex. Code Crim. Proc. Ann.] Article 38.22 when officers failed to read the defendant his rights prior to or during the interviews. When a person is not in custody and is free to terminate the interview and leave at any point, and a reasonable person in that situation would understand his status, then the aforementioned warnings are clearly not required by law. *Miranda v. Arizona*, 86 S. Ct. 1608 (1966); *Stansbury*; *Dowthitt*; *Stahle*; *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998).

3.  The defendant did not make any request for counsel which triggered a constitutional right to confer with counsel before continued questioning by officers. The September 9th discussion concerning counsel was not an unequivocal request for counsel. It certainly could not be described as clear and unambiguous. Under these circumstances officers were not required to cease questioning until the defendant had an opportunity to talk with counsel. This would have been true even if Scott had been in custody. *Davis v. United States*, 114 S. Ct. 2350 (1994); *Dinkins v. State*, 894 S.W.2d 330 (Tex. Crim. App. 1995). In a decision where the suspect-police officer discussion was strikingly similar to the case at bar, the San Antonio court of Appeals reversed itself in light of *Davis* and ruled that there was no violation of the defendant's right to counsel. *State v. Panetti*, 891 S.W.2d 281 (Tex. App.—San Antonio 1994 [pet. ref'd]).

    "When reviewing alleged invocation of the right to counsel, we typically look at the totality of the circumstances surrounding the interrogation, as well as the alleged invocation . . . ." *Dinkins*, at 351.

    Scott was at the interview of his own free will; he was free to leave at any time for whatever reason. He continued freely with the interview; he returned on many subsequent occasions; he later consulted with counsel <u>and</u> then continued with interviews. Given the ambiguous nature of the discussion concerning counsel, and after reviewing the totality of the circumstances, no violation of the defendant's right to counsel or right to remain silent occurred.

4.  The defendant's 6th Amendment right to counsel had not attached at the time the challenged statements were made. The right to counsel under this constitutional provision becomes effective at the initiation of adversarial proceedings, whether by way of indictment, formal charge, preliminary hearing, or arraignment. *Brewer v. Williams*, 97 S. Ct. 1232 (1977); *Moran v. Burbine*, 106 S. Ct. 1135 (1986).

5.  Under the totality of the circumstances, the defendant made a free and rational choice to speak. Neither specific incidents of police conduct, nor police conduct taken as a whole, rendered defendant's statements involuntary. No violation of due process or state or federal constitutional or statutory law occurred during defendant's questioning by police. See *Nenno* at 557-559, and cases cited therein.