**Opinion issued December 15, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00783-CR

———————————

**JUAN JIMENEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 183rd District Court**
**Harris County, Texas**
**Trial Court Case No. 1408197**

## MEMORANDUM OPINION

A jury convicted appellant, Juan Jimenez, of the offense of capital murder,

and, because the State did not seek the death penalty, the trial court automatically

assessed his punishment at confinement for life.[1]  In three issues, appellant contends that (1) the trial court erred in admitting evidence of several extraneous offenses in violation of Rules of Evidence 403 and 404(b); (2) the State failed to present sufficient evidence that he intentionally committed murder, as required to convict him of capital murder; and (3) the trial court erred in denying an instruction informing the jury that a particular witness must be considered an accomplice as a matter of law.

We affirm.

## Background

### A.    *Factual Background*

In the fall of 2013, Eric Nieto and appellant, who was twenty-four, had been friends for approximately two years.  Nieto and appellant knew each other's families, and appellant's girlfriend would occasionally babysit Nieto's two small children. Nieto, his common-law wife Cynthia Salguero, their children, and Nieto's brother-in-law David Arriola lived in the Greenridge townhomes in north Houston. Appellant and his girlfriend had visited Nieto's family at this address.

Around late August or early September 2013, Nieto and appellant's friendship soured after appellant allegedly stole Nieto's 9mm rifle from his bedroom.  Nieto

---

[1]    *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2016) (providing that person commits capital murder if person intentionally commits murder in course of committing or attempting to commit burglary or arson).

usually kept this rifle on top of the dresser in his bedroom, and only appellant knew of this hiding place. The gun went missing on the same day that appellant's girlfriend was alone in Nieto's home babysitting Nieto's children. Nieto confronted appellant about this theft in a phone conversation, and the men agreed to have a one-on-one fight at appellant's house. When Nieto arrived at appellant's house, a group of people was present outside, and Nieto drove home instead of stopping at appellant's house. About half an hour later, appellant called Nieto and they decided to fight one-on-one at Nieto's house. When Nieto came outside his house, he saw appellant and three carloads of people, some of whom had guns. Salguero called 9-1-1, but appellant left before the police arrived.

In response to this incident, Nieto and Salguero decided to move to a new house, which they did that same week. Nieto informed very few people of his new address, and he did not inform appellant. A security guard from a private security company, Seal Security, patrolled the townhome complex pursuant to a contract that Seal had with the complex's homeowner's association. Nieto informed the regular security guard, Officer Jackson, of the incident with appellant and told him that Nieto and his family were moving.

Approximately six weeks later, around midnight on November 9, 2013, appellant called his friend Ruben Pineda, who was fifteen years old at the time, and the two of them made plans to meet up roughly halfway between their respective

3

homes. Appellant did not immediately recognize Pineda when he approached, and appellant pulled out a gun and pointed it at Pineda. Pineda identified himself, and appellant lowered the gun. Pineda testified that he had seen appellant with this gun on a "daily basis," and he stated that the gun was a .357 caliber. Pineda also stated that appellant was slurring his words and that he appeared to be intoxicated on Xanax.

Appellant and Pineda visited a convenience store and then they decided to go to a local bar called Los Cabos. Salguero, Nieto's common-law wife, worked at this bar, and when appellant and Pineda arrived, they saw both Salguero and Nieto. Pineda and Nieto greeted each other in a friendly manner, but appellant and Nieto did not greet each other at all. Shortly after Pineda and appellant arrived, Nieto went to the restroom. Pineda and appellant began playing a game of pool, but appellant almost immediately abandoned the game in favor of also going to the restroom. Nieto and appellant had a "verbal confrontation" in the restroom that escalated into a physical fight. Pineda witnessed a portion of this fight, as did Salguero and the owner of Los Cabos. The owner broke up the fight and told appellant and Pineda to leave the bar. As the owner escorted appellant and Pineda out, Salguero saw appellant make a hand gesture in Nieto's direction that imitated the shooting of a gun. Salguero had seen appellant in possession of a handgun on a previous occasion.

4

After being kicked out of Los Cabos, appellant decided to vandalize Nieto's home by throwing a rock through a window, and he and Pineda began walking to the Greenridge townhomes because they believed Nieto still lived there. When they arrived at Nieto's old unit, they looked through the windows of the home, and they were surprised to discover that it was empty and that no one was living there. Appellant went inside the townhome and Pineda stayed outside. Pineda then heard several thumps and a sound of breaking glass, and when he looked inside the window, he saw a fire.

After the fire started, Pineda saw the flashing lights of a Seal Security car through the window. He shouted a warning to appellant, and the two of them began quickly walking through the townhome complex. As appellant and Pineda were walking away, Rafael Almanza, the Seal Security guard temporarily assigned to the Greenridge townhomes on this date and the complainant in this case, appeared behind them and yelled at them to stop. Instead of stopping, appellant and Pineda began to run. Pineda testified that appellant turned and fired at least four shots in Almanza's direction. After the shooting stopped, Pineda ducked behind a parked car and noticed that his hand was "red and wet," and he realized that he had been shot in the arm. Pineda looked back towards Almanza and saw him lying face-up and unmoving on the ground with a bullet wound in his head.

5

When Pineda stepped out from behind the parked car, he did not see appellant anywhere. Pineda headed towards appellant's house and met up with appellant along the way. Appellant's mother and brother were also present at the house, and Pineda testified that they "seemed to already know" what had happened that night. He stated that he and appellant freely discussed what had happened in the presence of appellant's mother and brother.[2] While at appellant's house, both appellant and Pineda changed clothes. Appellant changed into a shirt that read "snitches get stitches." Pineda testified that, to him, appellant's shirt meant that "[i]f [Pineda] said anything that happened that night, [he] was either going to get killed or brutally beat." Pineda also testified that appellant told him that appellant was "going to get caught" because he was the only one in the neighborhood who usually got into arguments with the Seal Security guard who regularly patrolled the Greenridge townhomes.

Two days later, Pineda went to school and ultimately confided in one of his teachers about what had happened with appellant and his own injury from the incident. Pineda was arrested later that day, and he spoke with officers from the Homicide Division of the Houston Police Department. The State charged Pineda

---

[2] Appellant's brother, Ricardo Jimenez, denied that appellant spoke about the shooting, instead stating that Pineda did most of the talking. He testified that he was not sure what had happened, but he could tell that Pineda had been shot in the arm. He also agreed that appellant owned a .357 caliber handgun.

with the misdemeanor offense of criminal mischief as a result of his conduct in connection with this incident.

David Arriola, who lived with Nieto and Salguero, testified that on the night of the shooting, while he was working as a security guard at a nearby apartment complex, he heard gunshots.[3] Based on the number of shots he heard, he estimated that the shooter used nearly two clips' worth of bullets. Arriola got off work at 3:00 a.m., approximately two hours after he heard the gunshots. He followed the sound of sirens to the house where he had lived with Nieto and Salguero, and he saw firefighters hosing down the unit. Arriola spoke with a reporter while standing outside at the scene, and during the course of the conversation he asked the reporter if he knew whether a 9mm or a .357 had been used. He indicated that he might know who was involved. The reporter directed Arriola to HPD Sergeant M. Holbrook. Arriola informed Sergeant Holbrook that he knew that appellant carried a .357, and he took Holbrook to appellant's address.[4]

---

[3] Arriola also testified that appellant had stolen Nieto's 9mm gun, that Nieto and appellant's friendship had soured as a result of this, that appellant had threatened Nieto, Salguero, and their children, that they all moved from the Greenridge townhomes due to these threats, that Nieto made a quick decision to move and not tell anyone their new address, and that they did not want appellant to know their new address.

[4] Sergeant Holbrook did not find a .357 handgun when he searched appellant's residence, but he did find four unfired .357 cartridges.

Almanza died as a result of his injuries. The autopsy revealed that Almanza had sustained six penetrating gunshot wounds, including wounds to his head, face, neck, shoulder, chest, and back, and a graze wound to his hand. Eight .357 caliber cartridge casings were recovered from the scene, all fired from the same weapon.

## B.     *Procedural Background*

The State charged appellant with capital murder. Specifically, the State charged appellant with intentionally causing the death of Almanza while in the course of committing and attempting to commit either burglary or arson.

At trial, before Nieto, Salguero, Arriola, and Pineda testified before the jury, they all testified outside the presence of the jury concerning several extraneous bad acts by appellant. Defense counsel repeatedly objected to evidence that appellant had stolen Nieto's gun, that appellant had threatened Nieto and his family, that Salguero had seen appellant with a gun, that appellant was known to carry a .357, that appellant had been warned to stay off the Greenridge townhomes property, that appellant and Nieto had gotten into a fight at Los Cabos, that Salguero saw appellant make a threatening hand gesture to Nieto while leaving Los Cabos, that appellant pointed a gun at Pineda on the night of the incident, that appellant was the only person known to get into arguments with Seal Security officers, that appellant put on a shirt after the incident that stated "snitches get stitches," and that appellant had possibly taken Xanax on the night of the incident. Defense counsel objected to all

8

of this testimony as irrelevant, as inadmissible evidence of extraneous bad acts, and on the ground that the prejudicial effect of the testimony substantially outweighed its probative value. The trial court overruled these objections. The trial court gave oral limiting instructions and included the following limiting instruction in the charge:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's committing an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

At the charge conference, defense counsel requested that the trial court instruct the jury that Pineda was an accomplice as a matter of law. The State responded that Pineda had not been charged as either a party or a co-conspirator to capital murder and that Pineda did not have the requisite mental state for capital murder. The State argued that the proposed charge, which instructed the jury to determine as a fact question whether Pineda was an accomplice, was correct. The trial court denied appellant's request. The charge included instructions about accomplices, law of parties, conspiracy, and the corroboration of accomplice testimony. The charge then stated:

9

[I]f you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness, Ruben Pineda, was an accomplice, or you have a reasonable doubt whether he was or not, as that term is defined in the foregoing instructions, then you cannot convict the defendant upon the testimony of Ruben Pineda unless you further believe that there is other evidence in the case, outside of the testimony of Ruben Pineda tending to connect the defendant with the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

The jury convicted appellant of the offense of capital murder. Because the State did not seek the death penalty, the trial court automatically assessed appellant's punishment at confinement for life. This appeal followed.

## Sufficiency of Evidence

In his second issue, appellant contends that the State failed to present sufficient evidence that he intentionally committed murder.[5]

### A.    *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v.*

---

[5]    In his second issue, appellant argues that the evidence is both legally and factually insufficient. It is well established that the Court of Criminal Appeals has abolished factual-sufficiency review of convictions and, thus, the only standard that is used in evaluating the sufficiency of the evidence is the *Jackson v. Virginia* standard. *See Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011).

*State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating that jury can choose to disbelieve witness even when witness's testimony is uncontradicted).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152,

11

155 (Tex. Crim. App. 2011) (quoting *Clayton*, 235 S.W.3d at 778). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

### B.    Capital Murder

To establish that appellant committed the offense of capital murder, the State had to prove that appellant intentionally caused the death of Rafael Almanza by shooting him with a deadly weapon while in the course of committing or attempting to commit the offense of either burglary or arson. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2016). A person acts intentionally, or with intent, "with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *See id.* § 6.03(a) (West 2011).

Intent is most often proved through circumstantial evidence, and a jury may infer intent from "any facts that tend to prove its existence, such as the acts, words, and conduct of the defendant." *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). A jury may infer intent to kill from the use of a deadly weapon, unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon. *Id.*; *Dominguez v. State*, 125 S.W.3d 755, 761–62 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (stating that

12

jury was entitled to infer intent to kill from defendant's use of shotgun, which is "a deadly weapon per se"). A firearm is a deadly weapon per se. *Dukes v. State*, 486 S.W.3d 170, 177 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (defining "deadly weapon" as including firearms)). When a defendant fires a deadly weapon at close range and death results, the law presumes an intent to kill. *Sholars*, 312 S.W.3d at 703; *Childs v. State*, 21 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

The State presented evidence that appellant and Pineda began quickly walking through the Greenridge townhomes complex when they saw Almanza, a private security guard, appear at the burning townhome unit. Almanza yelled at them to stop, but, instead of stopping, they began running away. During the chase, appellant turned and started shooting in Almanza's direction. Eight .357 cartridge casings, matching the caliber of gun appellant was known to carry, were recovered from the scene. Almanza sustained six penetrating gunshot wounds and one graze wound, including wounds to his head, neck, and chest; and he died as a result of his injuries. Pineda, who was in between appellant and Almanza, estimated that he was approximately ten feet away from Almanza when he was shot.

A jury may infer intent from the conduct of the defendant. *See Sholars*, 312 S.W.3d at 703. After setting fire to a townhome unit, appellant pulled out a firearm and began shooting at the security guard pursuing him as he ran from the scene. A

13

firearm is a deadly weapon per se. *Dukes*, 486 S.W.3d at 177. And a jury may infer intent to kill from the use of a deadly weapon. *Sholars*, 312 S.W.3d at 703. Moreover, when a defendant fires a deadly weapon at close range and death results, as in this case, the law presumes an intent to kill. *Id.*; *see also Medina v. State*, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999) ("Opening fire with an automatic rifle, at close range, on a group of people supports the conclusion that appellant acted with the specific intent to kill."). Based on the record, the jury in this case reasonably could have inferred that appellant had the intent to kill when he turned around and shot at Almanza, who was pursuing him as he fled from setting a fire in a vacant townhome.

Appellant argues that the State failed to prove specific intent to kill because "[t]here was no more intent on the part of Appellant to shoot the decedent than there would have been to injure Ruben Pineda, his friend and partner in the activities of the evening in question." He argues that the "unintentional shooting" of Pineda demonstrates his lack of intent to kill. Even assuming appellant unintentionally and accidentally shot Pineda, that does not negate his intent to kill Almanza. As appellant and Pineda fled from the burning townhome with Almanza in pursuit, Pineda was in between appellant and Almanza. Appellant turned around and fired his weapon several times in Almanza's direction. Officers recovered from the scene eight spent cartridge casings matching the caliber of gun that appellant was known

14

to carry and that Pineda had seen earlier that evening. Almanza sustained a total of seven gunshot wounds, including fatal wounds to his head, neck, and chest. During the shooting, one bullet also struck Pineda in the arm. The jury reasonably could have inferred that Pineda sustained an accidental injury because he happened to be located in between appellant and Almanza when appellant intentionally shot at Almanza.

We conclude that, viewing the evidence in the light most favorable to the verdict, the State presented sufficient evidence to support appellant's conviction.

We overrule appellant's second issue.

## Admission of Extraneous Bad Acts

In his first issue, appellant contends that the trial court erred in admitting evidence of several extraneous offenses and bad acts because these offenses constituted improper character evidence under Rule 404(b), and the prejudicial effect of these offenses substantially outweighed their probative value in violation of Rule 403.

We review a trial court's ruling on the admissibility of extraneous-offense evidence for an abuse of discretion. *Wilson v. State*, 473 S.W.3d 889, 899 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (citing *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009)). We will not reverse a trial court's ruling on an evidentiary matter unless the decision was "outside the zone of reasonable

15

disagreement." *Id.* at 899–900 (citing *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007)). We will not disturb the trial court's ruling if it can be justified on any theory of law applicable to the ruling. *Id.* at 900.

Rule 404(b) prohibits the introduction of extraneous offense evidence to prove a person's character or to prove that on a particular occasion the person acted in conformity with that character. TEX. R. EVID. 404(b)(1); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Wilson*, 473 S.W.3d at 900. Extraneous offense evidence may, however, be admissible if it has relevance apart from character conformity. *Devoe*, 354 S.W.3d at 469. Such evidence may be admissible to prove, for example, motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. TEX. R. EVID. 404(b)(2); *Devoe*, 354 S.W.3d at 469. "Evidence of another crime, wrong, or act also may be admissible as same-transaction contextual evidence where 'several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, . . . , of any one of them cannot be given without showing the others.'" *Devoe*, 354 S.W.3d at 469 (quoting *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000)). The jury is entitled to know "all relevant surrounding facts and circumstances of the charged offense." *Id.* However, same-transaction contextual evidence is admissible "only when the offense would make little or no sense without also bringing in that evidence, and it is admissible 'only to

16

the extent that it is necessary to the jury's understanding of the offense.'" *Id.* (quoting *Wyatt*, 23 S.W.3d at 25).

The proponent of extraneous offense evidence must be able to explain to the trial court "the logical and legal rationales that support [the evidence's] admission on a basis other than 'bad character' or propensity purpose." *De La Paz*, 279 S.W.3d at 343. Whether an extraneous offense has relevance apart from character conformity is a question for the trial court and thus is reviewed for abuse of discretion. *Devoe*, 354 S.W.3d at 469 (quoting *Moses*, 105 S.W.3d at 627). "A trial court's 404(b) ruling admitting evidence is generally within [the zone of reasonable disagreement] if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue." *Id.* (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)).

Rule 403 provides that a trial court may exclude otherwise relevant evidence if the probative value of that evidence is substantially outweighed by a danger of unfair prejudice, confusion of the issues, the misleading of the jury, undue delay, or the needless presentation of cumulative evidence. TEX. R. EVID. 403. The Court of Criminal Appeals has held that a trial court, when conducting a Rule 403 analysis, must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest [a] decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main

issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). A trial court's decision not to exclude evidence, based on a finding that the danger of unfair prejudice does not weigh the evidence's probative value, is entitled to deference. *See Wilson*, 473 S.W.3d at 900 (quoting *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

On appeal, appellant complains about the admission of several extraneous bad acts: testimony that appellant was known to carry a .357, that appellant had threatened Nieto and his family, that appellant had stolen Nieto's gun, that appellant had been warned to stay off the Greenridge townhomes property, that appellant and Nieto had gotten into a fight at Los Cabos on the night of the incident, that appellant had made a threatening hand gesture imitating shooting a gun at Nieto when he left Los Cabos, that appellant had pointed a gun at Pineda when they first met up on the night of the incident, that appellant had changed into a shirt stating "snitches get stitches" after the incident, and that appellant possibly had taken Xanax on the night of the incident. Appellant argues that the prejudicial effect of this testimony substantially outweighed its probative value.

All of the evidence that appellant complains about on appeal provides necessary context for the jury to understand the circumstances surrounding the charged offense of capital murder and appellant's actions on the night of the shooting. It is, therefore, admissible as same-transaction contextual evidence. *See Devoe*, 354 S.W.3d at 469; *Wyatt*, 23 S.W.3d at 25. Furthermore, several of the alleged bad acts were admissible for other purposes as well. *See* TEX. R. EVID. 404(b)(2) (providing that evidence may be admissible to show, among other things, motive, opportunity, intent, and lack of accident). The evidence of appellant's relationship with Nieto—which included allegations of theft, threats, and physical violence—tended to show appellant's motive for burglarizing and setting fire to what appellant believed to be Nieto's home. *See, e.g.*, *Gipson v. State*, 82 S.W.3d 715, 723 (Tex. App.—Waco 2002, no pet.) (holding that evidence of prior altercations and violence between defendant and complainant was admissible to show motive and intent to commit subsequent acts of violence against complainant).

HPD Crime Scene Unit officers recovered eight spent .357 cartridge casings from the scene of the shooting. This case thus involves a murder in which the complainant sustained multiple gunshot wounds and multiple .357 spent cartridge casings were found at the scene. Although officers never recovered the weapon used in the shooting, they did recover four unfired .357 casings from the search of appellant's house. The testimony concerning appellant's carrying of a .357 and his

19

pointing a .357 at Pineda on the night of the incident was relevant to his identity as the shooter and his opportunity to commit the offense. *See Scott v. State*, 165 S.W.3d 27, 52 (Tex. App.—Austin 2005) (holding that evidence that around time of murders, defendant was in possession of handgun similar to one used in offense was relevant and admissible), *rev'd on other grounds*, 227 S.W.3d 670 (Tex. Crim. App. 2007).

After the shooting, appellant changed into a t-shirt that stated "snitches get stitches." Pineda testified that his understanding, upon seeing appellant wearing this t-shirt, was that he would be beaten or killed if he told anyone about the incident. This evidence is probative of appellant's "consciousness of guilt," in that it was a threat to Pineda to stay quiet about what he had witnessed. A defendant's conduct after the commission of an offense which indicates a "consciousness of guilt" is admissible to prove that he committed the offense and is an exception to Rule 404(b)'s prohibition against the admission of extraneous offenses. *See Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). "[T]hreats made in an effort to suppress or destroy evidence are probative of consciousness of guilt." *Hedrick*, 473 S.W.3d at 830; *Keith v. State*, 384 S.W.3d 452, 460 (Tex. App.—Eastland 2012, pet. ref'd) (holding that defendant's statement to witness "[t]hat if anybody snitched him out or got him in trouble that he would

have them bumped off and they would clean up the mess" was admissible under Rule 404(b) as probative of consciousness of guilt).

We conclude that the trial court did not violate Rule 404(b) by admitting the complained-of evidence.

Appellant additionally argues that the extraneous bad acts evidence was "highly prejudicial" and that the evidence improperly influenced the jury. The State, as the proponent, had great need of this evidence, which provided context for why appellant was present at the Greenridge townhomes on the night of the incident and why he decided to vandalize a unit, which escalated to burglary, arson, and, ultimately, the shooting of a security guard. The evidence concerning appellant's relationship with Nieto provided a motive for appellant's actions, the evidence concerning appellant's carrying of a .357 connected him to the spent .357 cartridge casings found at the scene, and the evidence of appellant's threatening shirt, seen by Pineda, the only eyewitness to the shooting, indicated a consciousness of guilt. The probative force of this evidence was therefore great.

This evidence was not unfairly prejudicial. The trial court gave oral limiting instructions before Arriola's testimony concerning appellant carrying a .357 and before Nieto's testimony that appellant had previously stolen his gun, and the court included an identical instruction in the charge. The extraneous bad acts in this case all related to the context of the charged offense itself, and thus this evidence was

unlikely to distract the jury from the issues it had to decide. None of the extraneous bad acts evidence had the "potential to impress the jury in an irrational way." *See Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010) (noting that Rule 403 does not require exclusion of evidence "simply because it creates prejudice"; instead, "the prejudice must be 'unfair'"). Additionally, the complained-of evidence was not cumulative and did not "consume an inordinate amount of time." *See Gigliobianco*, 210 S.W.3d at 641–42.

We conclude that the trial court did not abuse its discretion by finding that the prejudicial effect of the complained-of evidence did not substantially outweigh its probative value. We hold that the trial court did not violate Rule 403 by admitting the complained-of evidence.

We overrule appellant's first issue.

**Accomplice Witness Instruction**

In his third issue, appellant contends that the trial court erred by failing to instruct the jury that Pineda must be considered an accomplice as a matter of law.

Code of Criminal Procedure article 38.14 provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). "An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state."

22

*Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011); *Delacerda v. State*, 425 S.W.3d 367, 394 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Presence at the crime scene does not make a person an accomplice; instead, an accomplice must have "engaged in an affirmative act that promotes the commission of the offense that the accused committed." *Smith*, 332 S.W.3d at 439. A person is not an accomplice if he knew about the offense and failed to disclose it or helped the accused conceal the offense. *Id.*

A witness may be an accomplice as a matter of law or as a matter of fact, and "[t]he evidence in each case will dictate whether an accomplice as a matter of law or fact instruction is required." *Id.* If the witness cannot be prosecuted for the same offense with which the defendant is charged or prosecuted for a lesser-included offense, the witness is not an accomplice as a matter of law. *Delacerda*, 425 S.W.3d at 394; *see also Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (stating that instructing jury that witness is accomplice as matter of law is appropriate "when the witness is charged with the same offense as the defendant or a lesser-included offense or when the evidence clearly shows that the witness could have been so charged"). "When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly." *Smith*, 332 S.W.3d at 439; *Delacerda*, 425 S.W.3d at 395 ("A trial court has no duty to instruct the jury that a witness is an accomplice witness as a

matter of law 'unless there exists no doubt that the witness is an accomplice.'")
(quoting *Druery*, 225 S.W.3d at 498). "When there is doubt as to whether a witness
is an accomplice (i.e., the evidence is conflicting), then the trial judge may instruct
the jury to determine a witness's status as a fact issue." *Smith*, 332 S.W.3d at 439–
40.

The Court of Criminal Appeals has held that "the conspiracy theory of party
liability applies in the accomplice-witness context" because an accomplice is a
person who may be charged with the same or lesser-included offense as that with
which the defendant is charged and "a person may be charged with an offense as a
principal, a direct party, or as a co-conspirator." *Zamora v. State*, 411 S.W.3d 504,
511 (Tex. Crim. App. 2013). Thus, "an accomplice-witness instruction is required
when the evidence raises the question of whether a witness is an accomplice under
a party-conspirator theory." *Id.* at 512. Penal Code section 7.02(b) sets out criminal
responsibility as a conspirator and provides, "If, in the attempt to carry out a
conspiracy to commit one felony, another felony is committed by one of the
conspirators, all conspirators are guilty of the felony actually committed, though
having no intent to commit it, if the offense was committed in furtherance of the
unlawful purpose and was one that should have been anticipated as a result of the
carrying out of the conspiracy." TEX. PENAL CODE ANN. § 7.02(b) (West 2011).

We review a trial court's decision to deny a requested accomplice witness instruction for an abuse of discretion. *Delacerda*, 425 S.W.3d at 395 (citing *Paredes v. State*, 129 S.W.3d 530, 538 (Tex. Crim. App. 2004), and *Nelson v. State*, 297 S.W.3d 424, 428–29 (Tex. App.—Amarillo 2009, pet. ref'd)).

Appellant requested that the trial court instruct the jury that Pineda was to be considered an accomplice as a matter of law. Specifically, appellant argued that Pineda's "testimony where he stated he was a lookout during the arson shows he was a party to the arson and, therefore, he should have anticipated under the conspiracy statute that death could have occurred in the course of committing an arson." The State pointed out that the proposed charge contained an instruction that the jury determine whether Pineda was an accomplice as a matter of fact and argued that this instruction was sufficient. The trial court agreed and denied appellant's request. The charge included the following instruction:

> An accomplice, as the term is here used, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Mere presence alone, however, will not constitute one a party to an offense.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or

25

attempts to aid the other person to commit the offense. The term "conduct" means any act or omission and its accompanying mental state.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

By the term "conspiracy" as used in these instructions, is meant an agreement between two or more persons with intent, that they, or one or more of them, engage in conduct that would constitute the offense. An agreement constituting a conspiracy may be inferred from acts of the parties.

You are instructed that a conviction cannot be had upon the testimony of an accomplice unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission. Motive and opportunity evidence is insufficient on its own to corroborate accomplice-witness testimony, but both may be considered in connection with other evidence that tends to connect the accused to the crime.

Therefore, if you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the witness, Ruben Pineda, was an accomplice, or you have a reasonable doubt whether he was or not, as that term is defined in the foregoing instructions, then you cannot convict the defendant upon the testimony of Ruben Pineda unless you further believe that there is other evidence in the case, outside of the testimony of Ruben Pineda[,] tending to connect the defendant with the offense charged in the indictment, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

Pineda testified that appellant usually carried a .357 and that appellant had that gun with him on the night of the incident, which he knew because appellant

26

pointed the gun at Pineda when they first met up that evening. Pineda was present at Los Cabos and witnessed at least part of appellant's fight with Nieto. He testified that after they were escorted from the bar, appellant came up with a plan to vandalize Nieto's home by throwing a rock through a window. When they arrived at the Greenridge townhomes, however, they discovered, to their surprise, that Nieto's unit was vacant. Appellant broke into the unit and started a fire in the bedroom while Pineda stood outside. Pineda then noticed the flashing lights of Almanza's security vehicle through the window and shouted a warning to appellant, who was still inside the unit. During the ensuing chase, appellant turned around and fired his weapon several times, hitting Pineda in the arm and killing Almanza.

The evidence only reflects the plan between appellant and Pineda to vandalize the unit they thought belonged to Nieto by throwing a rock through the window. Criminal mischief, the offense with which the State ultimately charged Pineda, is a misdemeanor. Pineda did not testify that they had a plan to break into the unit or to set the unit on fire. Nor does the evidence show that appellant told Pineda in advance of his intent to start a fire. Instead, the evidence reflects that appellant made these decisions on his own without consulting Pineda. However, Pineda did acknowledge that after appellant had decided to break in and was inside the unit setting a fire, he shouted a warning to appellant when he saw security lights. Furthermore, although there is no indication that appellant had communicated an intent to engage in further

27

physical violence after his fight at Los Cabos with Nieto, Pineda did know that appellant had a firearm in his possession while they were at the townhomes. *See* TEX. PENAL CODE ANN. § 7.02(b) (providing that co-conspirator may be criminally responsible for felony actually committed if "offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy").

Based on the evidence presented, which is conflicting, we cannot say that the evidence "clearly shows," or that there is "no doubt," that Pineda was an accomplice under a law-of-parties theory or a co-conspirator theory. *See Smith*, 332 S.W.3d at 439; *Delacerda*, 425 S.W.3d at 395. We therefore hold that the trial court properly instructed the jury to determine whether Pineda was an accomplice as a matter of fact. *See Smith*, 332 S.W.3d at 439–40; *Jester v. State*, 62 S.W.3d 851, 854 (Tex. App.—Texarkana 2001, pet. ref'd) ("If evidence presented by the parties is conflicting, the issue of whether an inculpatory witness is an accomplice is properly left to the jury as a fact question under instructions defining the term 'accomplice.' This is true even if the evidence shows more likely than not that the witness is an accomplice as a matter of law."). Thus, the trial court did not err in refusing appellant's requested instruction identifying Pineda as an accomplice as a matter of law.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).